**No. 22-50056**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JAZZMON UNIQUE RUSSELL,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court for the Central
District of California, No. 2:17-cr-00533-RGK-1
Hon. R. Gary Klausner, District Judge

———————————

## OPENING BRIEF FOR APPELLANT

———————————

Anne M. Voigts
KING & SPALDING LLP
601 S California Avenue
Suite 100
Palo Alto, CA 94304
(650) 422-6710
avoigts@kslaw.com

*Counsel for Jazzmon Unique Russell*

June 20, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION .......................................................................... 1

STATEMENT OF JURISDICTION........................................... 4

STATEMENT OF ISSUES................................................... 4

FACTUAL BACKGROUND ...................................................... 6

    A.    Summary of the Case........................................... 6

    B.    Pretrial Proceedings.......................................... 6

    C.    The Evidence at Trial ...................................... 10

        1.    The Recordings........................................... 11

        2.    The 2019 Incident ..................................... 15

        3.    The Forensic Evidence.............................. 16

        4.    Closing Arguments, Jury Instructions, and Deliberation............................................... 21

    D.    Russell's Request for New Counsel ................... 26

    E.    Sentencing ...................................................... 27

        1.    The PSR..................................................... 27

        2.    The Sentencing Papers .............................. 29

        3.    The Sentencing Hearing ............................ 30

SUMMARY OF ARGUMENT .................................................. 32

ARGUMENT ...................................................................... 33

I.    The Court's Evidentiary Errors At Trial Warrant Reversal Of Russell's Conviction.................................................... 33

A.     Standard of Review ...............................................33

B.     Admission of the Recordings Violated the Confrontation Clause and the Federal Rules of Evidence ..................................................36

       1.     The Constitution and Federal Rules of Evidence Limit the Introduction of Out-Of-Court Statements ..................................36

       2.     Those Limitations Barred the Admission of the Two Recordings ..................................39

       3.     Fed. R. Evid. 403 Also Barred Admission of the Recordings ..................................48

C.     The District Court Erred in Admitting the Evidence of Another Later Encounter With Law Enforcement Under Fed. R. Evid. 404(b) ...............49

D.     The District Court Erred in Admitting the DNA Evidence Without Holding a *Daubert* Hearing....................53

II.     The Court Erred In Instructing The Deadlocked Jury.................56

    A.     Standard of Review ...............................................56

    B.     The Court's Instruction Was Improper ................................56

III.     The Government Failed To Prove That Russell Was Guilty Beyond A Reasonable Doubt And The Insufficiency Of The Evidence Compels Reversal Given Cumulative Error .................59

    A.     Standard of Review ...............................................59

    B.     The Evidence Was Thin ..........................................59

IV.     The Court Should Have Granted A Continuance ..........................61

    A.     Standard of Review ...............................................61

B.     The District Court Erred in Denying Newly-Appointed Counsel's Request for a Three-Week Continuance ............................................................ 62

V.     The Court Should Have Granted The Motion To Replace Counsel ........................................................................ 64

A.     Standard of Review ................................................ 64

B.     The Court Should Have Granted the Motion ...................... 65

VI.    This Court Should Reverse Russell's Sentence Based On Procedural And Substantive Errors .............................. 66

A.     Standard of Review ................................................ 66

B.     The Court Did Not Explain the Sentence Imposed ............. 66

C.     The Sentence Imposed Was Substantively Unreasonable ........................................................... 69

CONCLUSION ...................................................................... 70

STATEMENT OF RELATED CASES ....................................... 1

certificate of compliance ........................................................ 2

certificate of service ............................................................. 3

# TABLE OF AUTHORITIES

## Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) .................................................................53

*Bemis v. Edwards*,
   45 F.3d 1369 (9th Cir. 1995).................................................................37

*City of Pomona v. SQM N. Am. Corp.*,
   866 F.3d 1060 (9th Cir. 2017)...............................................................52

*Crawford v. Washington*,
   541 U.S. 36 (2004) ................................................................................42

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...............................................................................11

*Davis v. Washington*,
   547 U.S. 813 (2006).........................................................................42, 43

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................................65

*Jackson v. Virginia*,
   443 U.S. 307 (1979) ..............................................................................57

*Massaro v. United States*,
   538 U.S. 500 (2003) ................................................................................3

*Morris v. Slappy*,
   461 U.S. 1 (1983) ..................................................................................60

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
   752 F.3d 807 (9th Cir. 2014)...............................................................52

*Ungar v. Sarafite*,
   376 U.S. 575 (1964) ..............................................................................60

*United States v. Ajiboye*,
   961 F.2d 892 (9th Cir. 1992).................................................................56

*United States v. Andujo,*
  2019 WL 4195887 (C.D. Cal. Sept. 4, 2019)......................................46

*United States v. Anekwu,*
  695 F.3d 967 (9th Cir. 2012)..............................................................34

*United States v. Arambula-Ruiz,*
  987 F.2d 599 (9th Cir. 1993)..............................................................36

*United States v. Audette,*
  923 F.3d 1227 (9th Cir. 2019)............................................................59

*United States v. Ayers,*
  924 F.2d 1468 (9th Cir. 1991)............................................................49

*United States v. Bailey,*
  696 F.3d 794 (9th Cir. 2012)..............................................................36

*United States v. Banks,*
  514 F.3d 959 (9th Cir. 2008)..............................................................56

*United States v. Benitez-Avila,*
  570 F.3d 364 (1st Cir. 2009) .............................................................40

*United States v. Berger,*
  473 F.3d 1080 (9th Cir. 2007).......................................................54, 55

*United States v. Berry,*
  627 F.2d 193 (9th Cir. 1980)..............................................................59

*United States v. Bettelyoun,*
  892 F.2d 744 (8th Cir. 1989)..............................................................45

*United States v. Bibo-Rodriguez,*
  922 F.2d 1398 (9th Cir. 1991)............................................................48

*United States v. Cantrell,*
  433 F.3d 1269 (9th Cir. 2006).......................................................64, 66

*United States v. Carpenter,*
  923 F.3d 1172 (9th Cir. 2019)............................................................36

*United States v. Chandler,*
    2011 WL 1979713 (D. Nev. May 19, 2011) .......................................50

*United States v. Cherer,*
    513 F.3d 1150 (9th Cir. 2008).................................................... 36, 49

*United States v. Chhun,*
    744 F.3d 1110 (9th Cir. 2014).........................................................57

*United States v. Cox,*
    963 F.3d 915 (9th Cir. 2020)................................................ 33, 35, 36

*United States v. Daas,*
    198 F.3d 1167 (9th Cir. 1999).........................................................56

*United States v. Della Porta,*
    653 F.3d 1043 (9th Cir. 2011).........................................................54

*United States v. Edwards,*
    235 F.3d 1173 (9th Cir. 2000).........................................................33

*United States v. Evanston,*
    651 F.3d 1080 (9th Cir. 2011).........................................................55

*United States v. Flores-Blanco,*
    623 F.3d 912 (9th Cir. 2010)...........................................................36

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir. 1996)...........................................................58

*United States v. Freeman,*
    498 F.3d 893 (9th Cir. 2007), *as amended* (Aug. 20, 2007) ...............56

*United States v. Garcia-Ocampo,*
    490 F. App'x 51 (9th Cir. 2012) .....................................................66

*United States v. Gissantaner,*
    990 F.3d 457 (6th Cir. 2021)...........................................................51

*United States v. Green,*
    648 F.2d 587 (9th Cir. 1981)...........................................................59

vi

*United States v. Grissom,*
525 F.3d 691 (9th Cir. 2008) ............................................................ 66

*United States v. Hammons,*
558 F.3d 1100 (9th Cir. 2009) .......................................................... 66

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000) .......................................................... 38

*United States v. Hinostroza,*
297 F.3d 924 (9th Cir. 2002) ............................................................ 49

*United States v. Jawara,*
474 F.3d 565 (9th Cir. 2006), *as amended* (Jan. 19, 2007) ................ 52

*United States v. Johnson,*
875 F.3d 1265 (9th Cir. 2017) ..................................................... 34, 35

*United States v. Jones,*
930 F.3d 366 (5th Cir. 2019) ............................................................ 40

*United States v. Kimbrew,*
406 F.3d 1149 (9th Cir. 2005) .......................................................... 64

*United States v. Kizzee,*
877 F.3d 650 (5th Cir. 2017) ............................................................ 40

*United States v. Kloehn,*
620 F.3d 1122 (9th Cir. 2010) ..................................................... 59, 60

*United States v. Lague,*
971 F.3d 1032 (9th Cir. 2020) ..................................................... 35, 36

*United States v. Lasley,*
917 F.3d 661 (8th Cir. 2019) ............................................................ 40

*United States v. Lindsey,*
634 F.3d 541 (9th Cir. 2011) ....................................................... 62, 63

*United States v. Marques,*
600 F.2d 742 (9th Cir. 1979),
*as amended on denial of reh'g* (July 24, 1979) ................................... 49

*United States v. Mason*,
658 F.2d 1263 (9th Cir. 1981)............................................................56

*United States v. McLennan*,
563 F.2d 943 (9th Cir. 1977)..............................................................44

*United States v. Mills*,
704 F.2d 1553 (11th Cir. 1983)..........................................................38

*United States v. Minners*,
362 F. App'x 931 (10th Cir. 2010) .....................................................41

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007)..............................................................34

*United States v. Morgan*,
675 F. App'x 53 (2d Cir. 2017).....................................................41, 42

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010)............................................................57

*United States v. Ontiveros*,
902 F.2d 41, 1990 WL 56821 (9th Cir. 1990)...............................48, 49

*United States v. Rendon-Duarte*,
490 F.3d 1142 (9th Cir. 2007)............................................................50

*United States v. Rewald*,
889 F.2d 836 (9th Cir. 1989)..............................................................38

*United States v. Romero*,
282 F.3d 683 (9th Cir. 2002)..............................................................48

*United States v. Ruvalcaba-Garcia*,
923 F.3d 1183 (9th Cir. 2019)............................................................52

*United States v. Sallins*,
993 F.2d 344 (3d Cir. 1993) .........................................................39, 45

*United States v. Singh*,
995 F.3d 1069 (9th Cir. 2021)............................................................34

*United States v. Valencia-Lopez,*
   971 F.3d 891 (9th Cir. 2020) ............................................................... 35

*United States v. Velazquez,*
   855 F.3d 1021 (9th Cir. 2017) ............................................................. 62

*United States v. Waknine,*
   543 F.3d 546 (9th Cir. 2008) ............................................................... 66

*United States v. Wallace,*
   848 F.2d 1464 (9th Cir. 1988), *as amended* (June 8, 1988) ................ 59

**Statutes**

18 U.S.C. § 922 ................................................................................... 4, 7

18 U.S.C. § 3231 ..................................................................................... 4

18 U.S.C. § 3553 .............................................................................. *passim*

18 U.S.C. § 3742 ..................................................................................... 4

28 U.S.C. § 1291 ..................................................................................... 4

Cal. Health & Safety Code § 11351.5 .................................................. 28

**Rules**

Fed. R. Evid. 401 .................................................................................. 38

Fed. R. Evid. 402 .................................................................................. 38

Fed. R. Evid. 403 ............................................................................. *passim*

Fed. R. Evid. 404 ............................................................................. *passim*

Fed. R. Evid. 602 .................................................................................. 37

Fed. R. Evid. 702 .................................................................................. 53

Fed. R. Evid. 703 .................................................................................. 11

Fed. R. Evid. 803 .............................................................................. 37, 44

**Other Authorities**

2 McCormick on Evidence § 249 (4th ed. 1992) ...................................... 39

2 McCormick on Evidence § 249 (8th ed.) ............................................... 39

Butler, John M., et al.,
      No. NISTIR 8351-DRAFT,
      DNA Mixture Interpretation:
      A NIST Scientific Foundation Review (June 2021) ........................... 10

Fed. R. Evid. 803 Advisory Comm. Notes (1972) ................................... 37

Imwinkelried, Edward J.
      *The Debate in the DNA Cases Over the Foundation for the*
      *Admission of Scientific Evidence: The Importance of Human*
      *Error as a Cause of Forensic Misanalysis*,
      69 Wash. U. L. Q. 19 (1991) ............................................................. 53

Jansson, Linda, et al.,
      *Individual Shedder Status and the Origin of Touch DNA*,
      56 Forensic Sci. Int'l: Genetics 1 (Oct. 30, 2021) ............................... 19

Ninth Cir. Model Jury Instruction 2.10 ................................................. 24

Ninth Cir. Model Jury Instruction 6.25 ........................................... 26, 55

U.S.S.G. § 2A2.2 .................................................................................... 29

U.S.S.G. § 2B2.1 .................................................................................... 30

U.S.S.G. § 2K2.1 .............................................................................. 28, 30

## INTRODUCTION

Defendant-Appellant Jazzmon Russell was convicted of being a felon in possession of a gun based on three pieces of evidence that the district court should never have admitted: (1) two recordings of calls with a 911 dispatcher—without calling any of the parties to them to testify; (2) evidence of an incident *two years after* the events at issue this trial where a gun was also found in Mr. Russell's car; and (3) DNA transfer evidence admitted without a proper hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1] Defense counsel challenged all three in pretrial motions, and the court denied them on the first day of trial with no findings or further explanation. Any one of those errors warrants reversal. Cumulatively, they require it.

There is a reason why this improper evidence was introduced— without it, it would have been substantially harder to get a conviction. Two guns and 11 rounds of ammunition were found in a console in Mr. Russell's car, but it was heavily disputed whether they actually belonged to Russell. The government offered no witnesses who testified to seeing him possessing those guns or ammunition, no confession that they were

---

[1] Mr. Russell was assigned female at birth, but identifies as male.

his, no photographs or video of him with them that night. Instead, it relied on constructive possession—because they were in his car, they should be attributed to him.

But the evidence the government put on to support that connection—the audio recordings played in court even though the speakers were never called to testify, the evidence of a later act that plainly veered into propensity evidence, and DNA testing that was new at the time, mishandled, and never subjected to appropriate evidentiary gatekeeping by the district court—cannot sustain his conviction. And as a result, those evidentiary errors warrant reversal.

Worse yet, when the jury reported that it was deadlocked after deliberating for nearly the same amount of time as presenting the evidence took, the court gave the jury an instruction over defense counsel's objection that lacked the protective language this Court has required to avoid undue coercion. The fact that the jury deadlocked underscores that these errors were not harmless and the evidence against Mr. Russell weak. The fact that the court then gave an improperly coercive instruction to the jury is both an independent basis

for reversal and an aggravating factor in assessing the impact of those other errors.

Moreover, shortly before trial was to begin, the court had granted Mr. Russell's motion for new counsel. The court replaced that counsel with a team that included a former Assistant United States Attorney who had been a supervisor in the section that had charged Mr. Russell at the time of his indictment.[2] The court then granted two short continuances allowing only 7 weeks to prepare for trial, but denied a third despite the fact that the government had produced substantial discovery and intended to put on an expert witness to testify about DNA. Unsurprisingly, communications broke down, and when Russell again sought to have counsel replaced after his conviction, the Court denied that motion too.

Errors permeated Mr. Russell's sentencing too. The court imposed the statutory maximum sentence of 120 months' imprisonment without addressing *any* of the Section 3553(a) factors, explaining why it was rejecting Mr. Russell's plea for a lower sentence, or acknowledging his

---

[2] Russell does not raise an ineffective assistance of counsel claim on direct appeal, but reserves his rights on collateral review. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

troubled childhood, his age, his serious health issues, and other mitigating circumstances. That sentence—more than five times longer than any of his prior convictions—cannot be justified on the record in front of the district court. It certainly cannot be justified in the absence of any explanation by the district court. This Court should vacate and remand for resentencing.

## STATEMENT OF JURISDICTION

Mr. Russell appeals his conviction and sentence under 18 U.S.C. § 922(g). The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and entered judgment on March 14, 2022. CR 175; 1-ER-2-3. The notice of appeal was timely filed on March 16, 2022. Federal Rule of Appellate Procedure 4(b); 3-ER-679. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF ISSUES

1. Whether the district court erred by admitting: (a) 911 recordings in violation of the Confrontation Clause and Federal Rules of Evidence; (b) evidence of a subsequent encounter with law enforcement in violation of Federal Rules of Evidence 404(b) and 403; and (c) DNA evidence without adequately considering whether that evidence satisfied *Daubert* and the Federal Rules of Evidence.

2.     Whether the Court erred in instructing the deadlocked jury to go back and consider the evidence without also telling it, consistent with this Court's model jury instructions, that the jurors should not feel compelled to return a verdict.

3.     Whether the court's evidentiary errors cumulatively, require reversal and whether the government failed to prove Mr. Russell guilty beyond a reasonable doubt.

4.     Whether the court erroneously denied Mr. Russell's request to replace counsel, claiming insufficient evidence, even though: (a) Mr. Russell raised complaints about his trial counsel's performance and his prior waiver of a conflict; and (b) both Mr. Russell and his counsel acknowledged the relationship was compromised.

5.     Whether the court erred in not granting a short continuance where trial counsel was appointed seven weeks earlier, there was substantial discovery as well as complicated expert analysis, and the government identified no specific prejudice it would face if the continuance were granted.

6.     Whether the court erred by imposing the statutory maximum without explaining its reasons for doing so.

# FACTUAL BACKGROUND

## A.    Summary of the Case

The government alleged that on the night of July 5, 2017, Mr. Russell possessed two guns and ammunition—but the guns were never found on his person, no one testified that they saw him holding or using them, and there was no evidence of gunshot residue on him or of his fingerprints on the guns.  Instead, the guns were discovered after a woman—who never testified at trial—called the Long Beach Police Department ("LBPD") to report that shots had been fired.  Responding to the call, LBPD officers stopped a gold Lexus sedan in which Mr. Russell was a passenger.  After detaining the driver and Mr. Russell, LBPD searched defendant's car, and found two loaded handguns in a hidden compartment near the center console accessible only by the driver.

## B.    Pretrial Proceedings

Russell was first charged with being a felon in possession of a firearm in August 2017.  3-ER-671-78, 1-ER-293-95.  On April 30, 2021, the grand jury returned a first superseding indictment charging Mr. Russell with one count of being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1).  1-ER-286-88.

Russell was initially represented by the Federal Public Defenders' Office. On August 6, 2021, the court granted Russell's request to substitute counsel. 3-ER-646-47. Russell contended that his counsel had not visited him and had not vigorously prepared for his defense. 3-ER-637-42. After hearing from Russell, the court granted his motion, finding "from the only evidence that is before the Court,… you have not been properly represented …." 3-ER-646.

That same day, lead counsel was appointed under the Criminal Justice Act. Serving with him as co-counsel was a former Assistant United States Attorney, who had served as deputy chief in the section that had indicted Russell.

A little over 7 weeks after the court granted the motion to substitute counsel, the case went to trial. In that time, the court granted two short continuances. CR 95, 96; 1-ER-284-85. Six days before the trial date, Russell's counsel asked for a continuance for three weeks, to October 19, 2021 because the government had produced approximately 7,500 pages of discovery in the case, at least approximately 3,000 pages of which, counsel noted, had been produced after his appointment on August 6. 3-

7

ER-629-32.  The government opposed that request, and on September 23, 2021, the court denied it.  CR 126; 1-ER-280.

Before trial, defense counsel filed a series of motions in limine and oppositions: (1) moving to exclude all evidence or argument relating to a shooting that allegedly took place on the night of Russell's arrest (CR 106); (2) opposing the government's motions in limine seeking to admit the recording of the 911 call reporting the shooting and the subsequent dispatch recording from the night of Russell's arrest (CR 75, 77); (3) opposing the government's motion to admit as Federal Rule of Evidence 404(b) evidence the events leading to Russell's 2019 arrest (CR 108); and (4) seeking to exclude the government's DNA expert given her use of a computer program, STRmix™, to help complete the DNA analysis in this case (CR 115, 116).  *See also* CR 106.

Despite the recent appointment of counsel, the district court issued an order barring any further motions in limine, citing the looming trial date, 1-ER-283, although it ultimately relented to allow Russell to file objections to the DNA report.  1-ER-281-83.

In those objections, Russell explained that because the collected samples contained only microscopic amounts of DNA, and were

8

comprised of complex DNA mixtures from multiple individuals, the government's proposed DNA expert was unable to perform a traditional DNA analysis on the samples. CR 115, 116. Instead, she input the extracted DNA data into a probabilistic-genotyping software program called STRmix. *Id.* That computer program, employing a type of Bayesian statistical analysis, calculated a likelihood ratio ("LR") that purportedly compares the likelihood that the sample contains DNA from the defendant against the likelihood that it originated from a number of unknown, unrelated individuals. *Id.*

Russell also explained that on June 9, 2021, the National Institute of Standards and Technology, an agency of the Department of Commerce, had issued a draft of its report entitled, "DNA Mixture Interpretation: A NIST Scientific Foundation Review." CR 115 at 2 (citing CR 115-2 (John M. Butler et al., No. NISTIR 8351-DRAFT, DNA Mixture Interpretation: A NIST Scientific Foundation Review (June 2021), *available at* https://nvlpubs.nist.gov/nistpubs/ir/2021/NIST.IR.8351-draft.pdf)). In it, NIST conducted an extensive review of the available literature analyzing probabilistic genotyping systems. *Id.* Significantly, as counsel pointed out, NIST concluded, inter alia: "Currently, there is not enough publicly

available data to enable an external and independent assessment of the degree of reliability of DNA mixture interpretation practices, including the use of probabilistic genotyping software (PGS) systems." *Id.* (quoting CR 115-2 at 75). Accordingly, Russell contended that the government's DNA evidence did not satisfy either *Daubert*, or Federal Rules of Evidence 703 and 403.

The court denied these motions summarily from the bench before jury selection, although it ordered the government to redact the statement "I think it was a handgun" from one of the recordings based on the lack of first-hand knowledge. 1-ER-43-44. It allowed the 2019 incident "as modus operandi, et cetera," but did not address (and made no findings under) Federal Rule of Evidence 403. 1-ER-44. And it denied the motion to exclude the DNA evidence without a *Daubert* hearing, addressing the Federal Rules of Evidence, or explaining its reasons. 1-ER-44.

## C. The Evidence at Trial

After the court gave initial instructions (which included no limiting instruction about the recordings, expert witnesses, or Rule 404(b) evidence), trial began. As the government made clear in its opening

10

statement, its case for possession turned on three things, that: (1) Russell's DNA was found on the guns; (2) the guns were found in his car; and (3) two years later, another gun was found in the same console compartment of his car. 1-ER-147-49. As the defense made clear in its opening, though, "[i]t's undisputed that no weapons or ammunition were found on Russell's person when he was searched in 2017. No one saw him hold, carry, or fire a gun that day." 1-ER-151. There was no evidence of fingerprints, and no witness who testified that Russell stored those guns in the console compartment, or that he was even aware that the guns were there. *Id.*

### 1. The Recordings

The government began by introducing and playing communications with and from the 911 dispatcher. Exs. 8, 10.[3] One was a nearly ten-minute set of calls that between a caller, the 911 dispatcher, and later another individual in the house. *Id.* The caller, who was at times audibly confused, and at other times distressed, reported that she had heard shots being fired, and that she thought it was her ex-boyfriend, Jazzmon

---

[3] Concurrent with this filing, Mr. Russell is submitting a motion for leave to submit the audio files that were played for the jury.

Russell.  Ex. 8.  She never explained why she thought it was Russell.  *Id.*
In response to the dispatcher's questions—questions that continued well
after the police arrived on the scene, she said that she thought Russell
was alone (Russell was not), and could not say what had actually been
shot at.  *Id.*  After she became upset, another person in the house got on
the phone and said they had heard the gun shots, but then admitted they
had been asleep at the time.  *Id.*  The second recording was a call between
the 911 dispatcher and the police officers on the scene, during which the
dispatcher told the officers that shots had been fired and the caller had
identified Russell as the "suspect," and the officer reported that the
passenger in the stopped car was not putting their hands up.  Ex. 10.

The government asked for, and the court gave, a limiting
instruction that the "communication from a dispatcher" was "admitted
for the limited purpose of why the Long Beach Police Department officers
responded to the Winward Village mobile park home on July 5.  And
therefore, [it] can only be considered for that limited purpose."  1-ER-160.
Notably, it did not say that the jury could not consider the recording (and
in particular the communications by the other participants) for the truth

of the matters asserted in it, nor did it explain what considering it "for the limited purpose of why" the officers were there meant. 1-ER-160.

The government then played the recording of the initial call to 911, which the government had not properly edited to omit the statement "I think it was a handgun." 1-ER-162 (Court: "Counsel did you edit it?" Government: "Your Honor, we are trying to skip past this."). However, when defense counsel objected under Rule 403, the Court overruled it. 1-ER-162. No separate limiting instruction was given as to this recording.

At the end of the first day, counsel moved for a mistrial because the portion of the tape that the court had ruled could *not* be admitted (namely, that there was a handgun) had been both played to the jury and displayed on a screen to them. 1-ER-248. The court noted the objection, but disagreed because it thought "it was a fleeting glimpse on the scree[n] ... [a]nd I don't recall even hearing the audio ...." 1-ER-249. It nonetheless warned the government that if the tape came in, it needed to be edited, "both on the transcript and on the audio." *Id.* No curative instruction was given to the jury.

Officer Tejada then went on to testify that when he arrived at the mobile home park, he saw a gold Lexus leaving with two people inside

13

it—the driver and Russell, the passenger. 1-ER-163-64. That car was registered to Russell. 1-ER-164. Tejada claimed that he had heard Russell say to "keep driving," that he had seen Russell's hands moving near the center of the car, and that the back window of the car in the driveway was shot out. 1-ER-166-70. This was accompanied by playing additional portions of the recording of the officers' exchange with the dispatcher, and the out-of-court statements of his partner, who was not a witness. 1-ER-167.

On cross, Tejada conceded that the windows of the car were up when he claimed to have heard Russell speak and that this would have made it difficult to hear Russell. 1-ER-177. He also conceded that although he included all important details in the report he contemporaneously produced, he had said nothing about Russell purportedly manipulating the center console and conceded he couldn't actually see what Russell was doing with his hands. 1-ER-178. (He also conceded the car had tinted windows and the encounter occurred when it was dark. 1-ER-179.) While the car in the driveway's back window was broken, he conceded that they found no bullet fragments in the car, that no one tested Russell's hands for gunshot residue, and that he had no

14

way of knowing when the damage was done to the car. 1-ER-188. Finally, he conceded he never asked the driver any questions. 1-ER-187-88.

The government also put on Detective Thai, who arrived on the scene later that night and took pictures of the car in the driveway. He also admitted that he found no bullet fragments in the car and that he could not know when the holes were made. 1-ER-198, 210-11. He testified about retrieving the guns and a single Coumadin tablet from the central console's compartment. 1-ER-201-02, 221.

### 2.  The 2019 Incident

The government then put on Pomona Police Officer Paul Lucifora to testify about a June 19, 2019 event when Russell was arrested driving his car, two years *after* the incident here. 1-ER-225-26, 229. No limiting instruction was given before or during his testimony. Lucifora testified that (unlike the encounter two years earlier), Russell was in the driver's seat when approached, and that they found a firearm hidden in the same compartment near the center console. 1-ER-229, 231-32.

The government then introduced the stipulated trial testimony of Officer Carlevaro, who had also been present at the scene. 1-ER-233.

15

Carlevaro testified that "only the driver's side of the center console and not the passenger's side could be raised," that the passenger side "still had factory screws in it," and that "it was obvious to me that only the driver and not a passenger can conceal a firearm in the center console of the car." 1-ER-233-34.

The government also put on ATF Agent Monica Uchiyama, who testified that she had reviewed records tying the car to Russell, and that, according to medical records from 2020, Russell had been prescribed Coumadin since 2013, although she conceded that she could not confirm that Russell was taking Coumadin on July 5, 2017. 1-ER-242; 2-ER-338, 342-43.

### 3. The Forensic Evidence

Uchiyama also conceded that while she obtained DNA swabs from Russell, she did not obtain any from the driver of the car that night. 2-ER-345-46. The government then called Heather Cochran, a forensic specialist, who testified about testing the guns for fingerprints and touch DNA. 2-ER-355-56, 363-64. She testified that she found no fingerprints on either gun. 2-ER-363. As to DNA, she explained that she used a single

swab so there was no way to determine where the DNA came from on the guns.  2-ER-368.

Testimony about the actual testing of those swabs came from Ellen Andrews, a senior criminalist.  2-ER-373-74.  She testified that she had used the STRmix computer software program, a program used to analyze samples with DNA from multiple individuals, to interpret the results of that testing.  2-ER-375, 383.  She tested 4 swabs, although only three were interpretable, and used a single reference DNA sample from Russell and no one else, including the driver of the car.  2-ER-378, 381.  More generally, she testified that STRmix, although "the last [she] heard" was used in 65 laboratories, was at the time a relatively new methodology both generally and in her lab (and for her).  2-ER-383.  As to her ultimate conclusions, Andrews testified that she believed that Russell was a contributor to the samples from the outsides of guns, but found only limited support for Russell being included in the sample from the magazine base and lifts of the cartridges, and was unable to draw any conclusions at all from the ammunition.  2-ER-385-89.

On cross-examination,  Andrews acknowledged the risk of transfer from one item to another from improper collection techniques.  2-ER-393.

17

She also acknowledged that she did not know how or under what conditions the guns and ammunition were collected in this case. 2-ER-393. She further conceded that the method of DNA analysis in this case—probabilistic genotyping—was a relatively recent development, and that prior to October 2017, the lab's primary method for DNA analysis was different and did *not* involve using STRmix. 2-ER-398-99.

Andrews confirmed that the actual quantity of DNA found was a trillionth of a gram, an extraordinarily tiny amount. 2-ER-402-03. Andrews also acknowledged that DNA can be transferred by, for example, shaking hands with someone who then touches an object, and that she had not reached any opinion about whether the DNA in question could have been transferred without direct touch. 2-ER-422, 426-29. She also conceded more generally that several people may have touched the item, that nothing about DNA analysis can or does show when particular touches occurred, and that DNA can be transferred to an item without an individual having actually touched it. 2-ER-401-02.

Andrews also acknowledged that the (reli)ability of the STRmix program could be affected by various factors, including the number of

assumed contributors.[4]  2-ER-406.  Accordingly, the STRmix program required the user to enter an assumed number of contributors, 2-ER-406-07, a number that Andrews had no way of reliably estimating.  Andrews also did not take into account the possibility of a close relative being a contributor and acknowledged that the STRmix software did not "do too well" in such circumstances.  2-ER-414-15  As she conceded, if there was a potential issue about relatives, "the proper thing to do is get the reference sample from any individual that might be associated with the case and compare that."  2-ER-415.  But, as she also conceded, the only reference sample she got was Russell's.  2-ER-416.

As defense counsel also elicited, there was also a problem with how the evidence had been handled.  Specifically, the analysis in this case involved a collision that had affected the sample.  2-ER-431.  During the extraction process, when DNA was removed using Tecan, a liquid handling instrument, the slides were jostled, and, as a result, the lab could only use the samples extracted before the collision.  2-ER-433.  As

---

[4] Transfer DNA is also affected by whether someone is a shedder—that is, someone who has a higher propensity to leave DNA behind—and thus to be transferred.  Linda Jansson et al., *Individual Shedder Status and the Origin of Touch DNA*, 56 Forensic Sci. Int'l: Genetics 1 (Oct. 30, 2021), https://pubmed.ncbi.nlm.nih.gov/34781198/.

19

a result of that, there was less DNA to analyze, and none to permit the defense to double-check the lab's analysis. 2-ER-433-34. And while the incident was mentioned in the lab's paperwork, Andrews acknowledged that it was done in a way that in "a layperson's view, it might not have been understandable;" as a result, the DNA technical lead wrote a memo one week before trial explaining what happened. 2-ER-435.

The defense's case consisted of reading portions of articles discussing a study of transfer DNA into the record. 2-ER-464-65. That study indicated that "forensic scientists have *no* way of knowing whether the DNA was left behind through such primary direct transfer." 2-ER-465 (emphasis added). "It could have been deposited by secondary transfer through an intermediary …." 2-ER-465 As the study found, after pairs of people shook hands for two minutes and each individual handled a separate knife, "[*i*]*n 85 percent of cases*, the DNA of the other person was transferred to the knife and profile. *In one-fifth of the samples*, the DNA analysis identified this other person *as the main or only contributor of DNA* to the weapon" even though they had never touched it themselves *Id.* (emphasis added).

20

### 4. Closing Arguments, Jury Instructions, and Deliberation

In closing, the government focused on three key pieces of evidence. It relied on the 911 call, telling the jury that "you heard [the caller] tell the 911 dispatcher *someone was outside her home shooting* a gun. And *she identified the shooter*, Jazzmon Russell, her ex, the defendant." 2-ER-481-82 (emphasis added) ("Inside that gold Lexus sedan was the defendant, *the same person Ms. Anderson identified as the shooter* outside of her home" (emphasis added)). The government pointed to the DNA, which it argued "combined with the series of events in this case proves defendant's guilt beyond a reasonable doubt." 2-ER-477-78, 485-86 ("His DNA. His car. His guns;" "His DNA. His guns. His car."). And the government made a straightforward propensity argument, contending that the jury could conclude that Russell was guilty in this instance because "[t]he defendant did it again two years later." 2-ER-483-84 ("this is called modus operandi or pattern of behavior").

In response, defense counsel pointed out that what Russell knew about the compartment in 2019—after the police had torn it up in 2017—said nothing about what he had known two years earlier. 2-ER-489. He reminded the jury that they could not consider the 2019 events for

21

propensity—a point the district court had not and did not make, and that in any event, the 2019 testimony confirmed that the compartment was not accessible from the passenger's side—where Russell was sitting in 2017. *Id.*

In rebuttal, the government returned again to the DNA analysis, the 2019 incident, and the 911 calls. 2-ER-515 ("The defense attorney said, well you can't consider the 2019 incident for proof of his 2017 knowledge. That's not what the law says."). And in defending Officer Tejada's testimony by claiming that "he got scared" on the stand, the government invoked the dispatcher's call *for the truth of the matter*, by arguing the jury could take into the evidence of his (non-testifying) partner's statement on the call that the passenger was not raising his hands.[5] 2-ER-516-17. In response to the defense, the prosecutor said "[y]ou heard Officer Tejada's partner tell the dispatcher, 911, the passenger of the car is refusing to raise their hands." *Id.* It also (improperly) told the jury that "[y]our doubts can't be based on

---

[5] The government also incorrectly told the jury they could believe Tejeda because "Detective Thai saw the defendant refused to raise his hands…." 2-ER-517. But Thai only testified that he saw Russell sitting in and then removed from the car. 1-ER-194. He never testified that Russell refused to raise his hands.

speculation. They have to be based on evidence." 2-ER-519. (In fact, it a jury can also find a defendant not guilty based on an *absence* of evidence, and the model instructions only preclude finding reasonable doubt based "purely" on speculation. 2-ER-523.)

The court then instructed the jury. The court reminded the jury that "[i]f some evidence was received only for a limited purpose, when I have instructed you to consider certain evidence in a limited way, you must do so," and that other act evidence could only be considered "for its bearing or not, if any, on the question of the defendant's intent, plan, knowledge, absence of mistake or absence of accident …." 2-ER-524, 526. The court did tell the jury that it was only there to decide whether Russell was guilty of the charge in the indictment: "The defendant is not on trial for any other conduct or offense not charged in this indictment." 2-ER-526. But it did *not* give the jury the model jury instruction language telling them that "[y]ou may not consider the evidence of these other acts as a substitute for proof that the defendant committed the crime[s] charged." Ninth Cir. Model Jury Instruction 2.10. And it did *not* tell it that: "You may not consider this evidence as proof that the defendant has a bad

character or any propensity to commit crimes." *Id.* Nor did it give *any* limiting instruction with respect to the 911 recordings before deliberations.

Defense counsel then made a motion under Federal Rule of Criminal Procedure 29 for an acquittal, which the court denied. 2-ER-535-36.

While deliberating, the jury sent out several notes. The first asked if they could play Exhibit 10, the recording of the call between the dispatcher and the officers. 3-ER-626. In response, the court replayed the audio of that call for the jury—and after asking them if they also wanted to hear Exhibit 8, the audio of the call to 911, also played that recording as well. 3-ER-570-73.

The second note, sent out after half a day of deliberations (following less than two full days of trial), indicated that the jury was "at a standstill even after discussing and going through <u>ALL</u> the evidence." 3-ER-627 (emphasis in original); 3-ER-573. The court indicated that it intended to bring the jury back in and tell them "I want them to go through the evidence very, very carefully and the instructions very, very carefully and see if it helps them." 3-ER-573-74. Defense counsel objected and asked for a mistrial, noting that "[t]hey've been going almost as long as the

evidence presentation now." 3-ER-574-75. The court declined to order a mistrial, summoned the jury, and told them:

> You have been deliberating for about a half day. That would be too soon to ever declare a mistrial on this. So we are going to send you back to continue your deliberations. If it helps, look very, very carefully at the evidence, very carefully at the instructions, and see if that helps at all as far as resolving the case. But at this time—I'm not going to be declaring a mistrial at this time. I will send you back and ask you to go over all the evidence and all the instructions and see if that helps you to resolve the case.

3-ER-575.

That instruction does not follow the Ninth Circuit's model jury instruction. Ninth Cir. Model Jury Instruction 6.25. In particular, the court did not tell the jurors that they had a duty to deliberate in an effort to reach a unanimous verdict if (and only if) "*if each of you can do so without violating your individual judgment and conscience*;" that "[y]ou should not … change an honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors *or for the mere purpose of returning a verdict*"; or that the instruction "is not meant to rush you *or pressure you into agreeing on a verdict*." *Id.* (emphasis added).

Shortly after the court gave that instruction, the jury returned a verdict of guilty on the single count of the indictment. 3-ER-575-76.

No post-trial motions were filed.

### D.  Russell's Request for New Counsel

On November 29, 2021, in a sealed hearing, Russell moved for new counsel. 4-ER-702. He noted that 7 weeks before trial, the Court had appointed new counsel, that one of those lawyers had been a supervisor in the section which sought his indictment at the time charges were brought against him, and that this represented a conflict of interest, which he had not fully knowingly and voluntarily waived. 4-ER-703-06. Defense counsel confirmed that his ability to communicate with Russell about sentencing had been compromised. *Id.*

The court nevertheless denied the motion, stating that, despite both Russell's and defense counsel's averring that the relationship had broken down, the defense had presented "nothing substantial" to the court to confirm this. 4-ER-706. The court did not inquire about or comment on Russell's statement that he had asked counsel to file post-trial motions and that no post-trial motions had been filed, or defense counsel's statement that communication was "impeded." 4-ER-705.

### E. Sentencing

#### 1. The PSR

The Presentence Report recommended an offense level of 26 and a criminal history level VI. PSR ¶ 27. As it noted, that resulted in a Guidelines sentence of 120 months—the statutory maximum available. PSR ¶ 101.

The Probation Office began with a base offense level of 24, based on U.S.S.G. Section 2K2.1(a)(2). PSR ¶ 19. It relied on two convictions—one in 2006, when Russell was 19 years old, for sale of cocaine base in violation of California Health & Safety Code Section 11351.5, which it concluded was categorically a controlled substance offense, and another in 2016, for sale of a controlled substance in violation of California Health & Safety Code Section 11351. PSR ¶¶ 17-19. Because that second conviction is categorically broader than the guideline definition, the Probation Office applied the modified categorical approach and looked to the information, which identified the underlying substance as hydrocodone. PSR ¶ 19. The Probation Office also applied a 2-level enhancement pursuant to Section 2K2.1(b)(4)(A) because the gun was stolen. PSR ¶ 20.

27

As the PSR acknowledged, Russell was assigned female at birth, but identifies as male. PSR ¶ 72. Mr. Russell went into the foster care system when he was 6 or 7 after his father went into custody. PSR ¶ 73. Russell's experience in foster care was "traumatic:" he was repeatedly sexually molested by his foster father when he was ten. PSR ¶ 74. After Russell reported the abuse, he was ultimately allowed to live with his maternal grandmother for two years, before being returned to the foster care system. *Id*. That second experience was no better than the first, including, in Russell's words, "more traumatic experiences," one of which was a group care employee breaking his arm at the age of 15. PSR ¶¶ 74-75. Russell was emancipated and on his own at the age of 17, which is approximately when he began to identify as a man—and when he reported beginning to use drugs to "numb" himself and "temporarily feel good." PSR ¶ 87-88. He told the Probation Office that he was "hoping for protection." PSR ¶ 76.

The PSR also acknowledged that Russell reported having a blood disorder that required him to take blood thinners and routine laboratory work. PSR ¶ 82.

### 2. The Sentencing Papers

Russell's sentencing papers did not dispute the PSR's guidelines calculations, but contended that in light of the childhood abuse Russell had endured, the fact that he had never before faced a federal felony conviction or any other sentence longer than two years, and his age, a guidelines sentence (which equated to the statutory maximum) was excessive. CR 168; 2-ER-297-303. As counsel also pointed out, the Guidelines overweight the offense level for felon-in-possession. 2-ER-302. For example, counsel pointed out, an aggravated assault involving the discharge of a firearm carries an Offense Level 19 (§ 2A2.2), 7 levels less than the offense level 26 the Probation Office recommended here, and would result in a Guideline range (at the same criminal history) of 63-78 months. 2-ER-302. A burglary offense involving the possession of a firearm likewise carries an Offense Level 19 (§ 2B2.1), and a recommended range (at the same criminal history) of 63-78 months. 2-ER-302.

Finally, as defense counsel pointed out, Russell had had significant health issues while in custody, having been hospitalized in late 2020 for deep vein thrombosis (DVT), after not receiving sufficient blood thinners

for his medical condition, and then undergoing surgery to address internal bleeding.[6]  2-ER-302-03

Despite these factors, the government argued for the statutory maximum.  CR 167; 2-ER-66.  It renewed its objections to the PSR's calculations, arguing that the court should also apply the four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) because defendant "used or possessed" the charged guns and ammunition "in connection with" two other felony offenses, although it conceded that that would have no impact on the guideline sentence, which was capped by the statutory maximum.  2-ER-312.  Accordingly, it argued, given Russell's criminal history, the alleged discharge of the gun, and the fact that a small quantity of drugs were found in the car, the statutory maximum was appropriate.  2-ER-309, 314.

### 3.    The Sentencing Hearing

The Court held sentencing on March 14, 2022.  1-ER-8.  At sentencing, defense counsel contended that an enhancement for use of a firearm in connection with a felony was not supported by the evidence

---

[6] Mr. Russell's health has continued to deteriorate in BOP custody and he has filed a motion for compassionate release that is currently pending in district court.

30

and that a Guidelines Sentence was far in excess of what the 18 U.S.C. Section 3553(a) factors called for. 1-ER-13-16. As counsel pointed out, Russell had never been convicted of a federal crime and the state sentences he had served were at most a year to a year and a half. *Id.* Accordingly, counsel argued for a 6-year sentence of imprisonment which is approximately what a charge of assault with discharge of a firearm would have resulted in here. *Id.* Counsel for Russell did not mention Russell's health issues, address whether or how BOP could provide adequate treatment for them (although he did ask that the court order that Russell receive his medication, 1-ER-27-28), and alluded only briefly to the violence and abuse Russell had suffered as a child. 1-ER-16

In response, the government acknowledged that the enhancement would not affect the guidelines range, and continued to argue for the statutory maximum of 120 months. 1-ER-19-21.

Without explanation, the Court adopted the Probation Office's Guidelines calculation and sentenced Russell to 120 months' imprisonment—the statutory maximum. 1-ER-21-26. It also imposed a $100 special assessment and a three-year term of supervised release. *Id.* In so doing, the Court never explained why it rejected Russell's request

31

for a below-Guidelines sentence.  It never addressed the Section 3553(a) factors.  And it never provided any reasons for imposing the sentence it did.  This appeal followed.

## SUMMARY OF ARGUMENT

This is a case about shortcuts.  At every turn, those shortcuts and the ensuing rush to judgment ran rough shod over Russell's rights.  It meant the trial court improperly admitted evidence without considering the challenges to it, despite the ensuing prejudice to Russell, gave an improper instruction to the jury when it reported that it was deadlocked, denied Russell replacement counsel when his relationship with counsel broke down over a conflict that Russell had felt pressured to waive in the first place, and refused a reasonable extension for newly appointed counsel to get up to speed rather than going to trial roughly 7 weeks after being appointed.  And it imposed sentence without bothering to address the Section 3553(a) factors, address Russell's arguments, or explain why it chose the statutory maximum.  This Court should reverse Russell's conviction and sentence.

# ARGUMENT

## I.    The Court's Evidentiary Errors At Trial Warrant Reversal Of Russell's Conviction

### A.    Standard of Review

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Cox*, 963 F.3d 915, 924 (9th Cir. 2020).  When they do not involve constitutional rights, such rulings will be reversed for an abuse of discretion if the underlying error more likely than not affected the verdict. *United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000) (per curiam).

1. <u>Confrontation Clause and hearsay exceptions</u>  Alleged violations of the Sixth Amendment's Confrontation Clause are generally reviewed de novo. *United States v. Singh*, 995 F.3d 1069, 1080 (9th Cir. 2021) (challenge to a district court's limitations on cross-examination).  Where, as here, counsel raised a hearsay but not a Confrontation Clause objection, this Court reviews for plain error. *United States v. Anekwu*, 695 F.3d 967, 972-73 (9th Cir. 2012) (reviewing Confrontation Clause argument for plain error).  Plain error requires a showing of: (1) an error; (2) that is clear or obvious; (3) that affects the defendant's substantial

rights; and (4) that "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotation marks omitted).

Whether the district court correctly construed the hearsay rule is a question of law reviewable de novo, where, as here, that objection was preserved. *United States v. Johnson*, 875 F.3d 1265, 1278 (9th Cir. 2017. However, a district court's decision to admit evidence under an exception to the hearsay rule is reviewed for an abuse of discretion. *Johnson*, 875 F.3d at 1278.

2. Expert testimony. A district court's decision to admit expert opinion testimony is reviewed for abuse of discretion. *Johnson*, 875 F.3d at 1280. However, "before admitting expert testimony, the district court *must perform* a gatekeeping role to ensure that the testimony is both relevant and reliable." *United States v. Valencia-Lopez*, 971 F.3d 891, 897-98 (9th Cir. 2020) (emphasis added) (cleaned up) (holding that district court abused its discretion by qualifying Immigration and Customs Enforcement Supervisory Special Agent as an expert without explicitly finding reliability of expert's proposed testimony).

3. Admission of evidence under Fed. R. Evid. 404(b). The district court's decision to admit evidence of prior crimes or bad acts pursuant to

Fed. R. Evid. 404(b) is reviewed for an abuse of discretion under a four-part test. *United States v. Lague*, 971 F.3d 1032, 1038 (9th Cir. 2020). Applying that test, a district court may admit other act evidence if: (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged. *United States v. Bailey*, 696 F.3d 794, 798-99 (9th Cir. 2012). The government "has the burden of proving that the evidence meets all of the above requirements." *Lague*, 971 F.3d at 1038 (quoting *United States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th Cir. 1993)).

On appeal, whether specific evidence falls within the scope of Federal Rule of Evidence 404(b) is a question of law reviewed de novo. *Lague*, 971 F.3d at 1037. In allowing Rule 404(b) evidence, while a district court is not required to recite the corresponding Rule 403 balancing analysis; the reviewing court must be able conclude, based on a review of the record, that the district court actually considered Rule 403's requirements. *United States v. Cherer*, 513 F.3d 1150, 1159 (9th Cir. 2008).

Where a district court errs in admitting other act evidence, the court reviews for harmless error. *United States v. Carpenter*, 923 F.3d 1172, 1181 (9th Cir. 2019).

### B. Admission of the Recordings Violated the Confrontation Clause and the Federal Rules of Evidence

The district court erred in admitting the recordings. That error was not harmless under the Federal Rules of Evidence, and constituted plain error affecting Russell's substantial rights under the Confrontation Clause.

### 1. The Constitution and Federal Rules of Evidence Limit the Introduction of Out-Of-Court Statements

The Confrontation Clause of the Sixth Amendment provides that: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In turn, *Crawford v. Washington*, 541 U.S. 36, 53–54, (2004), held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." While statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the

interrogation is to enable police assistance to meet an ongoing emergency, they are—or can become—testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822 (2006)

Separate and apart from the constitutional issues, the Federal Rules of Evidence also put limits on the admission of such recordings. While, as a general matter, "[h]earsay statements on a 911 tape can be admitted into evidence as either a 'public record' ... or a 'business record'," *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) (citing Fed. R. Evid. 803(6) & (8)(B)), "a recorded statement by a citizen must satisfy a separate hearsay exception. Under certain circumstances, such a statement may qualify as either a 'present sense impression,' Fed. R. Evid. 803(1), or an 'excited utterance,' Fed. R. Evid. 803(2)." 45 F.3d at 1372 (citations omitted). But "to qualify under either exception, an out-of-court statement must be nearly contemporaneous with the incident described," *and* the declarant must have personal knowledge of what she

describes. *Id.;* Fed. R. Evid. 602; Fed. R. Evid. 803 Advisory Comm. Notes (1972).

Even if such a recording qualifies under an exception to the hearsay rules, it must still be relevant. Under the Federal Rules, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence that is *not* relevant is not admissible. Fed. R. Evid. 402.

And even if relevant, evidence may be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403's "major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quoting *United States v. Mills*, 704 F.2d 1553, 1560 (11th Cir. 1983)). Notably, "as the probative value of evidence decreases, the potential increases for it to be substantially outweighed by the dangers identified in the rule." *United States v.*

*Rewald*, 889 F.2d 836, 853 (9th Cir. 1989). The evidence here failed at every step.

### 2. Those Limitations Barred the Admission of the Two Recordings

The admission of these recordings—particularly given the court's failure to apply a Rule 403 analysis, the government's error in failing to redact one recording before playing it to the jury, and the court's failure to provide adequate (or really any) limiting instructions—was reversible error. While these recordings were purportedly introduced to explain why the officers were there, they were not necessary for that purpose. And indeed, the government relied on them extensively in closing for another, entirely improper purposes—namely, the truth of the hearsay statements in them—to establish that shots had been fired, that Russell was "the shooter," and to corroborate one officer's testimony by invoking the recording of another, non-testifying officer about Russell's actions in the car. Moreover, those recordings, particularly the first, went well beyond any initial need to respond to a possible emergency and into an investigation of a crime.

"Where the government introduces evidence that bears on the ultimate issue in the case but that is not necessary to explain the

background of a police investigation, the only reasonable conclusion we can reach is that the evidence was offered, not as background, but as support for the government's case against the defendant." *United States v. Minners*, 362 F. App'x 931, 937 (10th Cir. 2010). Accordingly, in *Minners,* the Tenth Circuit found it error to admit a 911 call in a felon in possession case where, as here, the officer testified as to the nature of the call that had triggered his investigation, thus making the recording unnecessary. *Id.* (finding error nonetheless harmless where officers saw defendant holding gun and defendant admitted to possession).

"While officers generally should be allowed to explain the context in which they act, the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.'" *United States v. Sallins*, 993 F.2d 344, 346 (3d Cir. 1993) (quoting 2 McCormick on Evidence § 249 (4th ed. 1992)) (admission of 911 call containing description and fact that man had gun required reversal). In such cases, "[t]he need for this evidence is slight, the likelihood of misuse great." 2 McCormick on Evidence § 249 (8th ed.).

Accordingly, courts have cautioned, "a police officer cannot repeat such out-of-court accusations at trial, even if helpful to explain why the

40

defendant became a suspect or how the officer was able to obtain a search warrant." *United States v. Jones*, 930 F.3d 366, 377 (5th Cir. 2019) (citing cases). And in particular, "[s]tatements exceeding the limited need to explain an officer's actions can violate the Sixth Amendment—where a nontestifying witness specifically links a defendant to the crime, testimony becomes inadmissible hearsay." *Id.* (quoting *United States v. Kizzee*, 877 F.3d 650, 659 (5th Cir. 2017)). That is exactly what happened here.

Courts have found the admission of such evidence particularly problematic where, as here, the good faith of the prosecution is not challenged. *United States v. Benitez-Avila*, 570 F.3d 364, 367-71 (1st Cir. 2009) (admission of tip robbery victim received from an informant that the perpetrator was known as "Twin," the defendant apparently being a twin, was inadmissible hearsay and not justified by any nonhearsay purpose).

And courts have found limiting instructions ineffective to cure the ensuing prejudice. *United States v. Lasley*, 917 F.3d 661, 665 (8th Cir. 2019) (per curiam) (noting caselaw holding that a limiting instruction is unlikely to protect against highly prejudicial information when that

41

information went to the heart of the prosecution's case but reversing on other grounds); *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013), *as clarified on denial of reh'g (*Jan. 16, 2014) (limiting instruction not always sufficient to cure the harm of highly prejudicial information improperly admitted at trial).

That is particularly true here. The Court said that the evidence was "admitted for the limited purpose of why the Long Beach Police Department officers responded to the Winward Village mobile park home on July 5. And therefore, [it] can only be considered for that limited purpose." 1-ER-160. It did *not* tell the jury that it could not consider the recording (and in particular the communications by the other participants) for the truth of the matters asserted in it, nor did it explain to the jury that they could not consider it as evidence of defendant's guilt. 1-ER-160. By contrast, in *United States v. Morgan*, 675 F. App'x 53, 56 (2d Cir. 2017), the Second Circuit concluded the admission of a 911 call was not error because the district court *did* tell the jury that "[y]ou should *not take that evidence as indicating that there was in fact a man with a gun at the scene*." *Id.* (emphasis added).

42

The admission of these two calls violates the Confrontation Clause. As the Supreme Court acknowledged in *Davis v. Washington*, 547 U.S. 813, 828-29 (2006), while a "call for help against bona fide physical threat" is not testimonial, a conversation which begins as an interrogation to determine the need for emergency assistance can "evolve into testimonial statements," once that purpose has been achieved. *Id.* (quotation marks omitted). Indeed, the *Davis* Court noted that given the operator's "battery of questions" after the emergency appeared to have ended, "[i]t could readily be maintained that, from that point on, [the caller's] statements were testimonial, not unlike the 'structured police questioning' that occurred in *Crawford* [*v. Washington*, 541 U.S. 36, 53 n.4 (2004)]." 547 U.S. at 828-29. The Supreme Court noted that when trial courts "recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial," "[t]hrough *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." *Id.*

That, of course, is not what happened here. Although parts of the calls took place after the officers had located and stopped Defendants'

43

car, the 911 operator continued to ask questions that were less about addressing the earlier emergency and more about gathering information for an investigation. Moreover, the government erred by failing to make even the limited redaction the court did order.

The Confrontation Clause is not the only problem with the admission of those recordings. No exception to the hearsay rules solves the problem here. The 911 call was not admissible either as an excited utterance or a present sense impression, nor does the dispatch recording qualify as a business or public record. The first two exceptions depend upon personal knowledge, but as the records attached to Russell's motion in limine make clear, neither of the two individuals who spoke to the 911 dispatcher actually knew whether Russell had shot a gun. CR 106. To the contrary, the first individual did not see Russell getting, possessing, or shooting a gun, and indeed told police officers on the scene that she was in her bedroom when she heard the shots fired, and the second did not have any personal knowledge of the shooting, much less personal knowledge of Russell's purported involvement. Ex. 8. When questioned by the 911 dispatcher about the shots fired, they initially claimed that "we all" heard the shots, but then clarified that her "knowledge" was

"based on what everyone said." *Id.* (Although the court told the government to redact the statement about the gun because of the lack of personal knowledge, the government erroneously did not.) Simply put, the admission of layer on layer of hearsay on hearsay cannot be justified given the lack of personal knowledge.[7]

Nor does any hearsay exception apply to the dispatcher's statements relaying the contents of the 911 call. As the government made clear in both pre-trial motions and closing, the whole reason the government wanted to admit to these out-of-court statements was for the truth of the matter—specifically, to "corroborate LBPD Officer Manny Tejeda's anticipated testimony at trial ... that [] when Officer Tejeda stopped defendant's vehicle and asked defendant to put his hands up[,]

---

[7] Even if the lack of personal knowledge did not put paid to relying on either an excited utterance or present sense impression, those arguments also fail for other, independent reasons. For example, an excited utterance is "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "[W]hen a hearsay statement is offered under this exception, the trial court must make a preliminary factual determination that the declarant was so excited or distraught at the moment of utterance that [s]he did not reflect (or have an opportunity to reflect) on what [s]he was saying." *United States v. McLennan*, 563 F.2d 943, 948 (9th Cir. 1977). By contrast, the dispatcher displayed considerably more emotion than the second caller, who took her time in responding and did not appear distraught and for most of the call, the first.

defendant instead put his hands by the center console, where the guns and ammunition at issue were eventually found." CR 77 at 2. But using a non-testifying officer's statements made while investigating a potential crime to corroborate the testifying officer cannot be justified by *any* exception to the hearsay rules and runs afoul of the Confrontation Clause.[8] *Sallins*, 993 F.2d at 347 (excluding testimony relating to contents of police radio call because and noting that "[t]he absence of a tenable non-hearsay purpose for offering the contents of the police radio call establishes that the evidence could have been offered only for its truth value" (citing *United States v. Bettelyoun*, 892 F.2d 744, 746 (8th Cir. 1989))).

Before the district court, the government argued that alternatively, the recordings were admissible because they were inextricably intertwined with the underlying events. But they weren't. First off, that doctrine does not exempt evidence from the Confrontation Clause or hearsay rules. To the contrary, it applies to other bad acts that might otherwise be barred under Rule 404(b). Second, even if it did apply,

---

[8] Certainly, Federal Rule of Evidence 803's exception for public records does not apply because it expressly excludes "in a criminal case, a matter observed by law-enforcement personnel."

Officer Tejada could just as easily have testified that he was on the scene because he was responding to a 911 call. But that, of course, would not have allowed the government to assert that Russell had shot a gun, to imply that he was dangerous, or to bolster their testifying witness by introducing out-of-court statements by his non-testifying partner. While the government was candid about what they were trying to do, that candor does not insulate the underlying impropriety from reversal. *See, e.g., United States v. Andujo*, 2019 WL 4195887, at *1 (C.D. Cal. Sept. 4, 2019) (holding that testimony regarding basis for search warrant and circumstances around alleged theft did not relate to charged offense of possession of unregistered firearms).

The recordings were critical to the government's case, and to the jury's evaluation of that case. The fact that the jury specifically asked to hear the recordings again during deliberations only underscores their importance. As the government made clear in closing, that wasn't because they provided context for the case, it's because the government wanted to (and did) use them to *prove* that case. Accordingly, their

admission was plain error under the Confrontation Clause and not harmless error under the Federal Rules of Error.[9]

### 3. Fed. R. Evid. 403 Also Barred Admission of the Recordings

Finally, even if the recordings were somehow admissible despite the Federal Rules of Evidence and the Confrontation Clause, the Court erred by not excluding them under Federal Rule of Evidence 403 as unfairly prejudicial. The recordings were not particularly probative. Although the callers said they had heard shots and thought Russell had shot a gun, the bases for that assumption were never clear.

That those recordings were deeply and unfairly prejudicial, however, was entirely clear. First, they portrayed Russell as a violent individual even though Russell had no opportunity to cross-examine the

---

[9] Indeed, to the extent that defense counsel did not sufficiently expressly invoke the Confrontation Clause, those errors rise to the level of plain error affecting Mr. Russell's substantial rights. Using a non-testifying individual's out-of-court statements to corroborate a testifying witness without allowing a defendant the ability to cross-examine the non-testifying witness is a paradigmatic (and plain) Confrontation Clause error. And given the length of the jury's deliberations, their request to replay the recordings, and their reported deadlock, that error demonstrably affected Mr. Russell's substantial rights. This Court should reverse.

speakers and demonstrate the limits of their knowledge. Second, the government used the recording of non-testifying officers on the scene to improperly bolster the testimony of the testifying officer. And third, those recordings were the *only* evidence the jury asked to have presented to them during deliberations. For these reasons, the errors in admitting these records were not harmless.

### C.    The District Court Erred in Admitting the Evidence of Another Later Encounter With Law Enforcement Under Fed. R. Evid. 404(b)

The district court also abused its discretion in admitting evidence about Russell's 2019 arrest to prove Russell knew there were guns in his car *two years earlier*. (3-ER-650-51.) To introduce evidence of other bad acts or crimes under Rule 404(b), the Government must establish that the information (1) proves a material element of the offense for which the defendant is now charged; (2) is similar to the charged conduct; (3) is substantiated by sufficient evidence; and (4) is not too remote in time. *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002); *see also United States v. Ontiveros*, 902 F.2d 41, 1990 WL 56821, at *8 (9th Cir. 1990) (Table) (the conditions "must be met" before admitting Rule 404(b) evidence). While subsequent Rule 404(b) evidence may be relevant and

admissible, *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991), such evidence can still be excluded "if the evidence 'tends to prove *only* criminal disposition.'" *United States v. Hinostroza*, 297 F.3d 924, 928 (9th Cir. 2002) (quoting *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991)).

Even if the evidence passes this four-part test, though, it is still subject to Rule 403's balancing test and must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403. *E.g. Ontiveros*, 1990 WL 56821, at *7. Moreover, while a district court is not required to recite the corresponding Rule 403 balancing analysis; the reviewing court must be able conclude, based on a review of the record on appeal, that the district court considered Rule 403's requirements. *Cherer*, 513 F.3d at 1159.

The 2019 events do not satisfy either step. First, a conviction or bad act may be introduced to prove intent and modus operandi only when the evidence is sufficiently similar to the current offense. When there are significant differences between the two activities, courts will not allow

the inference that involvement in one showed intent to engage in the other. *See generally, United States v. Marques*, 600 F.2d 742, 751 (9th Cir. 1979), *as amended on denial of reh'g* (July 24, 1979); *United States v. Rendon-Duarte*, 490 F.3d 1142, 1143-44 (9th Cir. 2007) (refusing to admit evidence of prior incident where guns were also found in defendant's car for failure to satisfy Federal Rule of Evidence 404(b)).

Here, the two activities are not sufficiently similar and the fact that the 2019 event occurred later means it is not particularly probative as to defendant's knowledge two years earlier. Some courts have allowed *prior* act evidence to show knowing possession of a firearm when the prior acts involved the *same* firearm as charged in the case, *e.g. United States v. Chandler*, 2011 WL 1979713, at *5 (D. Nev. May 19, 2011) (finding the prior act evidence admissible because "Defendant's prior actions involve the same handgun as he is charged with possessing on or about February 12, 2010 and therefore his prior actions *are* relevant to his knowledge, motive, and intent with regard to that specific same handgun"). But this case involved *subsequent* acts and different guns. Moreover, the 2019 police report established that the center console was accessible *only* through the driver's side wall, where the screws had been loosened, and

that "only the driver (Suspect Russell) could conceal the firearm in this location." 3-ER-659. Of course, Russell was not the driver in 2017, although he was in 2019.

Even if this Court concludes that the evidence satisfied Rule 404(b), the district court committed reversible error by not considering whether that evidence ran afoul of Rule 403. Nothing in the record provides any indication that the court considered Rule 403 at all. Had it applied that analysis, it could not have admitted the evidence. That error is not harmless, in light of how thin the other evidence against Russell—and how unfairly prejudicial this testimony—was.

Finally, the ensuing prejudice is compounded by the district court's incomplete instruction to the jury. While the court did tell the jury that it was only there to decide whether Russell was guilty of the charge in the indictment: "The defendant is not on trial for any other conduct or offense not charged in this indictment," 2-ER-526, it did *not* give the jury the part of the model jury instruction telling them that "[y]ou may not consider the evidence of these other acts as a substitute for proof that the defendant committed the crime[s] charged." Ninth Cir. Model Jury Instruction 2.10. And it did *not* tell the jury that: "You may not consider

52

this evidence as proof that the defendant has a bad character or any propensity to commit crimes." *Id.*

### D. The District Court Erred in Admitting the DNA Evidence Without Holding a *Daubert* Hearing

The defense objected to the introduction of the STRmix evidence on the grounds that it did not satisfy the *Daubert* standard of reliability and the Federal Rules of Evidence. CR 115; *but see United States v. Gissantaner*, 990 F.3d 457 (6th Cir. 2021). It explained why this form of DNA analysis differed from more traditional methods and that an NIST report expressed doubts about its reliability. Moreover, this was a new technology for the lab at the time the analysis was run, and as Andrews' testimony made clear, the handling accident meant that the defense was deprived of the ability to run its own tests. 2-ER-431-32.

On that record, the district court was obligated to exercise its gate-keeping function and make a specific finding as to whether the expert testimony was reliable. *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1069 (9th Cir. 2017) ("[T]he failure to make any findings regarding the efficacy of [an expert's] opinions constituted an abdication of the district court's gatekeeping role, and necessarily an abuse of discretion."). It did not. Instead, on the first day of trial, the district court offered a

53

single sentence on its *Daubert* ruling: "The last one, motion to exclude the DNA evidence will be denied." 1-ER-44. The district court's failure to provide any "analysis or explanation" for its decision regarding this expert testimony beyond those two words is an abuse of discretion. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).

Nor was this error harmless. The government will of course argue that regardless of what the district court did or did not say, the DNA testimony satisfies *Daubert*, so the Court on appeal may "conclude that the district court's failure to make 'an explicit finding of reliability was harmless.'" *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019) (per curiam) (quoting *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2006), *as amended* (Jan. 19, 2007)). But here, the record does *not* establish that the STRmix method, even if "generally accepted" in the scientific community, was reliably applied in this case, as required by Federal Rule of Evidence 702. It is a question for the judge, not the jury, to determine whether methods were applied reliably, and the expert's testimony cast serious doubt on that factor.

As the expert explained, this was a relatively new method for the lab, and in carrying out the testing, there was a "collision," or "jostling," of the samples. 2-ER-431-32. Whether or not that collision affected the reliable application of the STRmix method was for the judge to decide, and a failure to follow the established protocol is grounds for exclusion of the expert's testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264, 268 (2d Cir. 2002) (excluding testimony by industrial hygienist who "failed to apply his own method reliably" because he did not consider volatility, vapor pressure, temperature, humidity, and radiant energy); *see also* Edward J. Imwinkelried, *The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash. U. L. Q. 19 (1991) (matters of lab protocol should affect admissibility, not just weight). Because, inter alia, the judge failed to make any determination as to whether the STRmix method was reliably applied in light of these factors, this Court cannot now conclude that the error was harmless.

## II. The Court Erred In Instructing The Deadlocked Jury

### A. Standard of Review

This Court reviews the trial court's decision to instruct the jury with an *Allen* charge for an abuse of discretion. *United States v. Berger*, 473 F.3d 1080, 1089 (9th Cir. 2007). Whether a judge has improperly coerced a jury's verdict is a mixed question of law and fact reviewed de novo. *Berger*, 473 F.3d at 1089; *see also United States v. Della Porta*, 653 F.3d 1043, 1047 (9th Cir. 2011).

### B. The Court's Instruction Was Improper

This Court's Model Jury Instruction states that:

> Members of the jury, you have reported that you have been unable to reach a unanimous verdict in this case. I have decided to suggest a few additional thoughts to you.

> As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict *if each of you can do so without violating your individual judgment and conscience.* Each of you must decide the case for yourself, but only after you consider the evidence impartially with your fellow jurors. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong. *You should not, however, change an honest belief as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.*

> I also remind you that in your deliberations you are to consider the instructions that I have given you as a whole.

You should not single out any part of any instruction, including this one, and ignore others. They are all equally important.

*What I have just said is not meant to rush you or pressure you into agreeing on a verdict.* Take as much time as you need to discuss things. There is no hurry.

I ask that you now return to the jury room and continue your deliberations with these additional comments in mind.

Ninth Cir. Model Jury Instruction 6.25. That carefully crafted language reflects the very real concerns that such instructions can improperly coerce a jury to reach a verdict.

The district court's instruction here—given over defense counsel's objection—included none of that careful cautionary language designed to ensure that the jury is not coerced into reaching a verdict. The jury had already deliberated, as defense counsel pointed out, for almost as long as the evidentiary portion of the trial itself had taken.

As this Court has recognized, courts should exercise extraordinary caution when giving such charges. *United States v. Evanston*, 651 F.3d 1080, 1085 (9th Cir. 2011). As this Court explained in *Berger*, 473 F.3d at 1089, "in their stronger forms, these charges have been referred to as dynamite charges, because of their ability to blast a verdict out of a

57

deadlocked jury." (quoting *United States v. Mason*, 658 F.2d 1263, 1265 n.1 (9th Cir. 1981)).  Indeed, that is exactly what happened here.

Where such charges have an impermissibly coercive effect on the jury, this Court must reverse.  *United States v. Banks*, 514 F.3d 959, 974 (9th Cir. 2008) (citing *United States v. Ajiboye*, 961 F.2d 892, 893 (9th Cir. 1992)).  In assessing whether such a charge was coercive, this Court considers "(1) the form of the instruction, (2) the time the jury deliberated after receiving the charge as compared to the total time of deliberation, and (3) any other indicia of coerciveness."  *United States v. Freeman*, 498 F.3d 893, 908 (9th Cir. 2007), *as amended* (Aug. 20, 2007) (citing *United States v. Daas*, 198 F.3d 1167, 1179-80 (9th Cir. 1999)).  Here, the court summoned the jury and told the juror that it was too early to be deadlocked and that they should go back and consider all the evidence. The court did not remind them that they should not change their minds simply to arrive at a verdict. And although the jury had deliberated at length before sending the note that they were deadlocked, they reached a verdict relatively quickly after the court told them to go back and try again.  Accordingly, this court should reverse and remand.

58

## III. The Government Failed To Prove That Russell Was Guilty Beyond A Reasonable Doubt And The Insufficiency Of The Evidence Compels Reversal Given Cumulative Error

### A. Standard of Review

This Court reviews de novo a district court's denial of a motion for a judgment of acquittal and reviews de novo claims of insufficient evidence. *United States v. Chhun*, 744 F.3d 1110, 1116-17 (9th Cir. 2014). In assessing the sufficiency of the evidence, this Court must "determine whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The Court "review[s] a district court's denial of a motion for a new trial under the 'abuse of discretion' standard." *Chhun*, 744 F.3d at 1117.

### B. The Evidence Was Thin

As the evidence at trial established, no one saw Russell holding a gun. No one saw him firing one. The gun was not found on his body or in his bag. Instead, it was found in a compartment that he could not access as a passenger. Moreover, the vaunted DNA evidence did not establish that Russell had held the guns—just that, at most his DNA was

59

found on their outside. But as the government's own expert conceded, she could not confirm whether the DNA was the result of Russell handling the guns, or simply a function of the guns being in his car and exposed to the tiny fractions of DNA that this testing method detects through mishandling, or someone else touching Russell and then touching the guns. And the officer on the scene's testimony fell apart on the stand, as he conceded that the windows were up and tinted thus undercutting his claim that he could hear and see into the car. And the 2019 incident in which Russell was the driver says nothing about whether he knew in 2017 as a passenger that there were guns in a compartment he could not easily access as a passenger.

The government's hodgepodge of evidence is not enough to sustain Russell's conviction. It also demonstrates that the evidentiary errors described above were not harmless (or, in the case of the Confrontation Clause, did affect his substantial rights).

That is particularly true given the cumulative nature of the errors. As this Court and others have recognized, in some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

prejudice a defendant. *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *United States v. Green*, 648 F.2d 587, 592-93 (9th Cir. 1981) (per curiam). Where, as here, there are a number of errors at trial, "a balkanized, issue-by-issue harmless error review" is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant. *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988), *as amended* (June 8, 1988). In those cases where the government's case is weak, as it is here, a defendant is more likely to be prejudiced by the effect of cumulative errors. *United States v. Berry*, 627 F.2d 193, 200-01 (9th Cir. 1980). This Court should reverse.

## IV. The Court Should Have Granted A Continuance

### A. Standard of Review

This Court reviews the district court's failure to grant a continuance for abuse of discretion and will reverse arbitrary or unreasonable denials. *United States v. Audette*, 923 F.3d 1227, 1240 (9th Cir. 2019). "An arbitrary denial of a continuance is subject to the harmless error test." *United States v. Kloehn*, 620 F.3d 1122, 1130 (9th Cir. 2010).

**B.** **The District Court Erred in Denying Newly-Appointed Counsel's Request for a Three-Week Continuance**

Although courts have broad discretion in deciding whether to grant a party's request for a continuance, the denial of a continuance contravenes a defendant's Sixth Amendment right to the effective assistance of counsel if, as here, there was "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). In reviewing such decisions, this Court considers four factors: (1) the extent of the appellant's diligence in readying his or her defense prior to the set hearing date, (2) the likelihood that the need for the continuance could have been met had the district court granted the continuance, (3) the inconvenience potentially caused by granting the continuance, and (3) the extent of the harm the appellant might have suffered as a result of the denial. *Kloehn*, 620 F.3d at 1127. All these factors cut in favor of Russell, and the ensuing error was not harmless.

First, Russell's counsel was diligent despite difficult circumstances. Counsel was appointed approximately seven weeks before trial—a trial involving substantial discovery, the testimony of an expert, a range of

challenging evidentiary issues, and events that had taken place several years ago and had been investigated by local law enforcement, rather than federal officers. Add to that a client who had already had one counsel relieved, and who had had very little time to build a rapport with current counsel, and there was every reason to grant a continuance rather than deny it.

Instead, the court cut off motions in limine, in light of the looming trial date, even though granting the continuance could have allowed for further investigation and motions' practice on critical issues. The court dismissed Russell's request on the grounds that he did not need to review the new discovery, but Russell did—he, not his counsel, was present on both nights. He, not his counsel, could easily identify where accounts or putative evidence diverged from what had happened. The short continuance would have allowed for more communication between Russell and his counsel, and the denial of it gave improperly short shrift to Russell's right to participate in his own defense. And because the continuance was a short one, it would not have meaningfully inconvenienced the government—indeed, the government's opposition did not point to any specific prejudice it faced. Instead, it relied primarily

on the age of the case (which was not the fault of Russell's new counsel). That satisfied the second and third factors.

Finally, the court's insistence on proceeding to trial harmed Russell—it limited the bringing of additional motions in limine, it shortened the time to prepare his case (indeed, the defense did not put on any case aside from reading an article into the record), and it left defense counsel struggling to get up to speed on complicated DNA evidence that the government had had years to consider. Thus, for example, rather than having a witness to testify about transfer DNA, defense counsel had to read an article into the record—a substantially less effective and convincing method of presenting a counter-narrative. Because that error was not harmless, this Court should reverse.

## V. The Court Should Have Granted The Motion To Replace Counsel

### A. Standard of Review

Denial of a motion for substitution of counsel is reviewed for an abuse of discretion. *United States v. Velazquez*, 855 F.3d 1021, 1033 (9th Cir. 2017); *United States v. Lindsey*, 634 F.3d 541, 554 (9th Cir. 2011).

In reviewing the district court's exercise of discretion, the court of appeals considers three factors: (1) the adequacy of the court's inquiry

into the defendant's complaint; (2) the extent of conflict between the defendant and counsel; and (3) the timeliness of the motion and the extent of resulting inconvenience and delay. *Lindsey*, 634 F.3d at 554.

## B. The Court Should Have Granted the Motion

The court's decision to deny Russell's request that counsel be replaced was an abuse of discretion for three reasons: first, the court's inquiry into Russell's complaint was wholly inadequate and the conflict at that point deeply entrenched. Faced with statements by both Russell and his counsel explaining the reasons for allowing substitution, the court nonetheless claimed that Russell had not introduced any evidence warranting reversal. But Russell explained why he felt that the conflict was so pronounced, and both he and his lawyer agreed that communications had broken down. And Russell brought the motion in a timely manner, and weighing his constitutional right to a fair trial with effective counsel against potential reputational harm makes it clear that any resulting inconvenience cannot be laid at Russell's feet.

## VI. This Court Should Reverse Russell's Sentence Based On Procedural And Substantive Errors

### A. Standard of Review

Courts of Appeals "review[] the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of [a] case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005). If the district court committed no error in applying the Guidelines, the Court "next consider[s] challenges to the reasonableness of the overall sentence in light of all the 18 U.S.C. § 3553(a) factors, including the applicable Guidelines range." *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006).

### B. The Court Did Not Explain the Sentence Imposed

Title 18 § 3553(a) regarding Crimes and Criminal Procedure instructs courts to consider a number of factors that must be considered when imposing a sentence. More specifically, Section 3553(a) advises that a district court shall consider the nature and circumstances of the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentences available, the kinds of sentences and the

sentencing range established for the applicable category of offense committed by the applicable category of defendant, and pertinent policy statement, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

When reviewing a sentence determination, a court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or *failing to adequately explain the chosen sentence*—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007) (emphasis added). When evaluating a potential procedural error, this court "review[s] the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Grissom*, 525 F.3d 691, 696 (9th Cir. 2008) (quoting *Cantrell*, 433 F.3d at 1279).

A sentencing court must consider the parties' recommended sentences and decide whether they are supported by the Section 3553(a) factors. *United States v. Hammons*, 558 F.3d 1100, 1104 (9th Cir. 2009) ("In this case, the district court offered no explanation for imposing a ten-month sentence upon Hammons. The district court did not discuss the applicable guideline range, nor did the district court address any of the applicable sentencing factors set forth in § 3553 and § 3583."). Failure to "consider expressly the § 3553(a) factors" is plain error. *United States v. Waknine*, 543 F.3d 546, 554 (9th Cir. 2008) (finding that there was "no contemporaneous announcement of the calculated Guidelines range or satisfaction of the requirement that the sentence be reconciled for reasonableness in light of the § 3553(a) factors."); *see also Hammons*, 558 F.3d at 1104 (holding that a district court's failure to consider the 18 U.S.C. § 3553(a) factors was plain error); *United States v. Garcia-Ocampo*, 490 F. App'x 51, 53 (9th Cir. 2012) (same).

Here, it is not a question of whether the district court's explanation was adequate, because the district court gave no explanation at all. It did not explain why it chose the sentence it did, it did not explain why it rejected the sentence defense counsel asked for, and it did not explain

68

how (or even if) it had weighed the Section 3553(a) factors in making up its mind. This Court should reverse and remand.

## C. The Sentence Imposed Was Substantively Unreasonable

Finally, Russell's sentence is substantively unreasonable. The statutory maximum sentence is not appropriate here—it does not reflect Russell's troubled childhood, his serious and chronic health issues, or the fact that the sentence is exponentially longer than any prior sentence he has served. It also does not take into account the Sentencing Guidelines' comparative overweighting of felon in possession charges as compared to other crimes—including violent crimes or the fact that federal terms of imprisonment tend to result in lower rates of recidivism—as does age upon release. All of those factors cut in favor of a below-Guidelines sentence—and remand for resentencing here.

69

## CONCLUSION

For the reasons set forth above, this Court should reverse Russell's conviction, or, in the alternative, vacate his sentence and remand for resentencing.

Respectfully submitted,

*/s/ Anne M. Voigts*
Anne M. Voigts
KING & SPALDING LLP
601 S California Avenue
Suite 100
Palo Alto, CA 94304
(650) 422-6710
avoigts@kslaw.com

*Counsel for Jazzmon Unique Russell*

June 20, 2023

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, I state that I am not aware of any related case pending in this Court.

Date: June 20, 2023

/s/ Anne M. Voigts

Anne M. Voigts

*Counsel for*
*Jazzmon Unique Russell*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(C), I certify that this brief complies with the length limitations set forth in Rule 32(a)(7)(B)(i) because it contains 13,999 words, as counted by Microsoft Word, excluding the items that may be excluded under Rule 32(a)(7)(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word 365ProPlus in Century Schoolbook 14-point font.

Date: June 20, 2023

*/s/ Anne M. Voigts*
Anne M. Voigts

*Counsel for*
*Jazzmon Unique Russell*

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Anne M. Voigts*
Anne M. Voigts

*Counsel for*
*Jazzmon Unique Russell*