No. 22-50056

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAZZMON UNIQUE RUSSELL,

*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 17-533-RGK*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

DAVID R. FRIEDMAN
Assistant United States Attorney
Criminal Appeals Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-7418
Email: David.Friedman@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                      **PAGE(S)**

I.    INTRODUCTION ............................................................................ 1

II.   ISSUES PRESENTED ................................................................... 2

III.  STATEMENT OF THE CASE ....................................................... 3

      A.    Jurisdiction, Timeliness, and Bail Status ............................. 3

      B.    Statement of Facts and Procedural History .......................... 3

            1.    Defendant is repeatedly convicted of drug and firearms offenses .......................................................... 3

            2.    Defendant is found in possession of two loaded firearms while fleeing the scene of a shooting ............. 4

            3.    Defendant is charged with being a felon in possession ...................................................................... 8

            4.    Defendant is arrested after again being found with a loaded firearm hidden in his car ....................... 8

            5.    The district court denies defendant's final request for a continuance .......................................................... 9

            6.    A jury convicts defendant of being a felon in possession .................................................................... 13

                a.    The recordings .................................................... 13

                b.    The 2019 arrest ................................................... 17

                 c.    The DNA evidence ............................................. 19

                 d.    Verdict ................................................................ 21

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                          **PAGE(S)**

7. The district court denies defendant's request to appoint new counsel before sentencing ........................22

8. The district court sentences defendant to a low-end term of 120 months in prison................................23

IV. SUMMARY OF ARGUMENT .....................................................26

V. ARGUMENT ............................................................................31

    A. The District Court Did Not Commit Any Evidentiary Errors that Warrant Reversal ...............................................31

        1. Standard of review ......................................................31

        2. Both recordings were properly admitted....................32

            a. The 911 call ..........................................................33

            b. The dispatch recording .......................................39

            c. Rule 403 ................................................................40

        3. Evidence of the 2019 arrest was properly admitted ........................................................................42

        4. The district court did not plainly err by declining to hold a *Daubert* hearing...........................................48

        5. Any error was harmless..............................................52

    B. The District Court's *Allen* Charge Was Appropriate ...........53

        1. Standard of review ......................................................53

        2. The district court's instruction did not coerce the jury ............................................................................54

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                              **PAGE(S)**

C. Sufficient Evidence Supports Defendant's Conviction .........57

    1. Standard of review ......................................................57

    2. The government presented ample evidence of defendant's guilt ...........................................................58

D. The District Court Properly Denied Defendant's Final Request for a Continuance ...................................................61

    1. Standard of review ......................................................61

    2. Defendant failed to establish a basis for a tenth continuance on the eve of trial ....................................61

E. The District Court Properly Denied Defendant's Request for New Counsel Before Sentencing .......................65

    1. Standard of review ......................................................65

    2. Defendant failed to establish a basis for another counsel change before sentencing ...............................65

F. The District Court Did Not Commit Any Errors in Imposing Defendant's Sentence ...........................................68

    1. Standard of review ......................................................68

    2. The district court did not provide a plainly insufficient explanation for defendant's sentence .......69

    3. Defendant's low-end sentence was substantively reasonable ...................................................................73

VI. CONCLUSION ...................................................................75

iv

# TABLE OF AUTHORITIES

**DESCRIPTION**                                             **PAGE(S)**

## Federal Cases

*Bemis v. Edwards,*
45 F.3d 1369 (9th Cir. 1995) ................................................................. 37

*Crawford v. Washington,*
541 U.S. 36 (2004) ................................................................................ 34

*Davis v. Washington,*
547 U.S. 813 (2006) .............................................................................. 34

*Greenwood v. FAA,*
28 F.3d 971 (9th Cir. 1994) ................................................................. 37

*Greer v. United States,*
141 S. Ct. 2090 (2021) .......................................................................... 32

*Jackson v. Virginia,*
443 U.S. 307 (1979) .............................................................................. 57

*Johnson v. United States,*
520 U.S. 461 (1997) .............................................................................. 73

*Lockhart v. Nelson,*
488 U.S. 33 (1988) ................................................................................ 60

*McDaniel v. Brown,*
558 U.S. 120 (2010) .............................................................................. 60

*Michigan v. Bryant,*
562 U.S. 344 (2011) ........................................................................ 35, 36

*Morris v. Slappy,*
461 U.S. 1 (1983) ...................................................................... 29, 63, 65

*Rita v. United States,*
551 U.S. 338 (2007) ........................................................................ 69, 70

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                      **PAGE(S)**

*Suggs v. Stanley,*
    324 F.3d 672 (8th Cir. 2003)................................................................39

*United States v. Alatorre,*
    222 F.3d 1098 (9th Cir. 2000)......................................................32, 49

*United States v. Alvirez,*
    831 F.3d 1115 (9th Cir. 2016)............................................................31

*United States v. Amezcua-Vasquez,*
    567 F.3d 1050 (9th Cir. 2009).............................................30, 70, 71

*United States v. Audette,*
    923 F.3d 1227 (9th Cir. 2019)............................................................61

*United States v. Bailey,*
    696 F.3d 794 (9th Cir. 2012)......................................................46, 53

*United States v. Beck,*
    418 F.3d 1008 (9th Cir. 2005)............................................................38

*United States v. Bibo-Rodriguez,*
    922 F.2d 1398 (9th Cir. 1991).................................................42, 43, 45

*United States v. Boise,*
    916 F.2d 497 (9th Cir. 1990)..............................................................47

*United States v. Booth,*
    669 F.2d 1231 (9th Cir. 1981)............................................................40

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) (en banc)..............................................71

*United States v. Cawley,*
    630 F.2d 1345 (9th Cir. 1980)............................................................39

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

*United States v. Chischilly*,
  30 F.3d 1144 (9th Cir. 1994)...............................................................51

*United States v. Daas*,
  198 F.3d 1167 (9th Cir. 1999)..........................................28, 54, 55, 56

*United States v. Daly*,
  974 F.2d 1215 (9th Cir. 1992).............................................................41

*United States v. Easter*,
  66 F.3d 1018 (9th Cir. 1995)...............................................................56

*United States v. Feldman*,
  788 F.2d 544 (9th Cir. 1986)...............................................................48

*United States v. Gadson*,
  763 F.3d 1189 (9th Cir. 2014)..............................................................49

*United States v. Gil*,
  58 F.3d 1414 (9th Cir. 1995)...............................................................40

*United States v. Gonzales*,
  307 F.3d 906 (9th Cir. 2002)...............................................................33

*United States v. Gutierrez-Sanchez*,
   587 F.3d 904 (9th Cir. 2009).......................................................31, 74

*United States v. Hadley*,
  918 F.2d 848 (9th Cir. 1990)...............................................................47

*United States v. Hernandez*,
  105 F.3d 1330 (9th Cir. 1997)..............................................................56

*United States v. Hicks*,
  103 F.3d 837 (9th Cir. 1996)...............................................................51

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Hinostroza,*
297 F.3d 924 (9th Cir. 2002)................................................................44

*United States v. Hougen,*
76 F.4th 805 (9th Cir. 2023) ......................................................52, 73

*United States v. James,*
2021 WL 4027812 (9th Cir. 2021) (unpublished)................................50

*United States v. Jernigan,*
341 F.3d 1273 (11th Cir. 2003)............................................................43

*United States v. Johnson,*
132 F.3d 1279 (9th Cir. 1997)..............................................................46

*United States v. Laurienti,*
731 F.3d 967 (9th Cir. 2013)................................................................73

*United States v. Leavitt,*
608 F.2d 1290 (9th Cir. 1979) (per curiam)........................................64

*United States v. Lloyd,*
807 F.3d 1128 (9th Cir. 2015)......................................................44, 61

*United States v. Lopez,*
762 F.3d 852 (9th Cir. 2014)................................................................37

*United States v. Lundy,*
83 F.4th 615 (6th Cir. 2023) ................................................................39

*United States v. Martinez-Alcazar,*
668 F. App'x 206 (9th Cir. 2016)....................................................27, 42

*United States v. McClendon,*
782 F.2d 785 (9th Cir. 1986)................................................................66

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                             **PAGE(S)**

*United States v. Mende*,
43 F.3d 1298 (9th Cir. 1995)...........................................................40

*United States v. Mitchell*,
744 F.2d 701 (9th Cir. 1984)...........................................................64

*United States v. Moorhead*,
57 F.3d 875 (9th Cir. 1995).............................................................43

*United States v. Morales*,
108 F.3d 1031 (9th Cir. 1997) (en banc)..........................................52

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010) (en banc)......................................57, 60

*United States v. Olano*,
507 U.S. 725 (1993).......................................................................48

*United States v. Overton*,
573 F.3d 679 (9th Cir. 2009)...........................................................74

*United States v. Parker*,
549 F.2d 1217 (9th Cir. 1977).........................................................46

*United States v. Pogosian*,
2023 WL 8663875 (9th Cir. 2023) (unpublished)..............................72

*United States v. Portsmouth Paving Corp.*,
694 F.2d 312 (4th Cir. 1982)...........................................................38

*United States v. Preston*,
751 F.3d 1008 (9th Cir. 2014) (en banc)..........................................60

*United States v. Ramirez-Jiminez*,
967 F.2d 1321 (9th Cir. 1992).........................................................48

# TABLE OF AUTHORITIES (continued)

## DESCRIPTION                                             PAGE(S)

*United States v. Redlightning,*
   624 F.3d 1090 (9th Cir. 2010)..................................................53

*United States v. Rendon-Duarte,*
   490 F.3d 1142 (9th Cir. 2007)..................................................44

*United States v. Ressam,*
   679 F.3d 1069 (9th Cir. 2012) (en banc)..............................69

*United States v. Reyes-Bosque,*
   596 F.3d 1017 (9th Cir. 2010)........................... 65, 66, 67, 68

*United States v. Romero,*
   491 F.3d 1173 (10th Cir. 2007)...............................................72

*United States v. Roston,*
   986 F.2d 1287 (9th Cir. 1993).................................................31

*United States v. Rubio-Villareal,*
   927 F.2d 1495 (9th Cir. 1991)................................. 43, 45, 47

*United States v. Ruvalcaba-Garcia,*
   923 F.3d 1183 (9th Cir. 2019)................................ 28, 49, 50

*United States v. Sandoval-Orellana,*
   714 F.3d 1174 (9th Cir. 2013)...............................................69

*United States v. Smith,*
   282 F.3d 758 (9th Cir. 2002).................................. 66, 67, 68

*United States v. Solorio,*
   669 F.3d 943 (9th Cir. 2012).................................. 35, 40, 60

*United States v. Steele,*
   216 F. Supp. 3d 317 (S.D.N.Y. 2016)..................................38

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                    **PAGE(S)**

*United States v. Valencia-Barragan*,
   608 F.3d 1103 (9th Cir. 2010) ................................. 70, 71, 72

*United States v. Vallejo*,
   237 F.3d 1008 (9th Cir. 2001) ....................................... 54

*United States v. Vasquez-Perez*,
   742 F.3d 896 (9th Cir. 2014) ......................................... 70

*United States v. Vences*,
   169 F.3d 611 (9th Cir. 1999) ......................................... 73

*United States v. Walter-Eze*,
   869 F.3d 891 (9th Cir. 2017) ......................................... 62

*United States v. Whittemore*,
   776 F.3d 1074 (9th Cir. 2015) ....................................... 38

*United States v. Yijun Zhou*,
   838 F.3d 1007 (9th Cir. 2016) ....................................... 36

**Federal Statutes and Laws**

18 U.S.C. § 922(g)(1) ........................................................ 8

18 U.S.C. § 3231 .............................................................. 3

18 U.S.C. § 3553(a) .......................................................... 70

18 U.S.C. § 3553(c) .......................................................... 69

18 U.S.C. § 3742(a) ........................................................... 3

28 U.S.C. § 1291 .............................................................. 3

Bipartisan Safer Communities Act,
   Pub. L. No. 117-159, 136 Stat. 1313 (2022) ...................... 23

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

## Federal Rules

Fed. R. App. P. 4(b)(1)(A) ................................................................3

Fed. R. Evid. 403 ................................................................ passim

Fed. R. Evid. 404(b) ............................................................ passim

Fed. R. Evid. 801(c)(2) ...............................................................39

Fed. R. Evid. 803(1) ............................................................37, 40

Fed. R. Evid. 803(2) ...................................................................37

## United States Sentencing Guidelines

U.S.S.G. § 2K2.1(b)(6)(B) .......................................................24, 26

U.S.S.G. § 5G1.1(c)(1)...............................................................23

No. 22-50056

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

JAZZMON UNIQUE RUSSELL,
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 17-533-RGK

## GOVERNMENT'S ANSWERING BRIEF

## I

## INTRODUCTION

Defendant is an eight-time felon with multiple convictions for illegal firearms possession. During the early morning hours of July 5, 2017, he went to his ex-girlfriend's house and fired several shots into a car parked in the driveway. The police quickly responded and found two loaded guns in his car. Based on this incident, a jury convicted him of being a felon in possession of firearms and ammunition.

Defendant now argues that various errors require reversal of his conviction and vacatur of his sentence. The jury, however, properly convicted defendant based on the strong evidence of his guilt, and the district court's decision to impose a low-end sentence was reasonable. Accordingly, this Court should affirm in all respects.

## II

## ISSUES PRESENTED

A.     Whether the district court committed any prejudicial evidentiary errors during trial.

B.     Whether the district court abused its discretion by giving the jury an *Allen* charge after a half-day of deliberations.

C.     Whether there was sufficient evidence of defendant's guilt.

D.     Whether the district court abused its discretion by declining to grant defendant's final request for a continuance.

E.     Whether the district court abused its discretion by declining to appoint new counsel before sentencing.

F.     Whether defendant's low-end sentence was procedurally or substantively unreasonable.

# III

# STATEMENT OF THE CASE

## A.    Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This

Court's jurisdiction rests on 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

The district court entered its amended, final judgment on March 16,

2022.  (1-ER-2-7; *see* 3-ER-696 (showing entry date).)[1]  Defendant filed a

timely notice of appeal that day.  (3-ER-679.)  *See* Fed. R. App. P.

4(b)(1)(A).  Defendant is currently in custody, serving the sentence

imposed in this case.

## B.    Statement of Facts and Procedural History

### 1.    *Defendant is repeatedly convicted of drug and firearms offenses*

Defendant has a long history of committing drug and firearms

offenses.  (PSR ¶¶ 38-67.)  Since 2005, he has been convicted of seven

felonies in California state court.  (PSR ¶¶ 41-47.)  His extensive record

---

[1]  "CR" refers to the Clerk's Record in the district court, "ER" refers to the Excerpts of Record filed by defendant, "SER" refers to the government's Supplemental Excerpts of Record, "AOB" refers to defendant's opening brief, "PSR" refers to the Presentence Investigation Report, and "Ex." refers to two audio recordings that were admitted at trial, which defendant has sought leave to transmit to this Court.

includes three convictions for being a felon in possession of a firearm
(PSR ¶¶ 42, 44, 47), another two convictions for illegal possession of a
firearm (PSR ¶¶ 44, 47), and two convictions for drug trafficking (PSR
¶¶ 41, 46). While on supervision in one of these state cases (PSR ¶¶ 46,
49), defendant committed the instant offense.

### 2. *Defendant is found in possession of two loaded firearms while fleeing the scene of a shooting*

Around 3 a.m. on July 5, 2017, two officers responded to a report
of shots fired at a mobile home park in Long Beach, California. (1-ER-
158-59.) The victim, A.A., had called 911 and reported that her "ex"—
defendant—was "outside [her] house shooting." (Ex. 8 at 00:15-42.)
Defendant had been "threatening" A.A. "to come outside" shortly before
the shots were fired. (PSR ¶ 5; 2-ER-322 (threats occurred "a minute"
before shots).) The officers would later learn from another victim who
was in the house that night, U.M., that defendant "had been harassing
A.A. all week." (PSR ¶ 9; 2-ER-322.)

When the officers arrived at the mobile home park, they saw
defendant's gold Lexus sedan, with two people inside, trying to leave
the complex. (1-ER-163, 194.) The officers ordered the driver to stop
the vehicle, but the passenger—later identified as defendant—

urged the driver, "Just keep driving. Just drive." (1-ER-166.) The officers also told both the driver and defendant to put their hands up. (*Id.*) The driver complied, but defendant instead moved his hands toward the center console as if he was trying to conceal something. (1-ER-166-67.) After approximately ten minutes, defendant showed his hands, and he was taken into custody. (1-ER-167-68.)

The officers then searched defendant's car. (1-ER-199; 2-ER-322.) During this search, they lifted a plastic portion of the center console that surrounded the gear shifter:



(1-ER-200-03; SER-123.) They found, among other things, a loaded Charter Arms .38 special caliber revolver and a loaded Springfield XD 9mm semiautomatic handgun. (1-ER-204-08.)

Both firearms were hidden in a secret compartment next to the gear shifter:



(SER-131.)  The .38 caliber revolver contained four spent cartridge casings, which suggested that it had recently been fired.  (1-ER-213; 2-ER-460-61.)  The officers also found two plastic baggies in the hidden compartment, which contained cocaine and prescription pills.  (PSR ¶ 35.)  Notably, the pills included a tablet of Coumadin (1-ER-221-22)—a blood thinner that defendant has taken for his medical conditions since at least 2013 (2-ER-337-38).

In addition to searching defendant's car, the officers investigated the shooting.  (*See* 2-ER-322-23.)  Officer Tejeda spoke with the driver

(2-ER-323), and also went to A.A.'s house, which was a one-to-two minute drive from the entrance of the mobile home park (1-ER-169-70). He found a car in the driveway with a shattered rear windshield:



(1-ER-170; SER-115-17.)  He also noticed a bullet hole in the back seat:



(1-ER-170; SER-118 (bullet hole circled in red), 120 (same).)

7

### 3.   *Defendant is charged with being a felon in possession*

Defendant was charged with several state drug and firearms offenses.  (PSR ¶¶ 36, 52.)  While these charges were pending, the federal government adopted the case.  In August 2017, a federal grand jury charged defendant with one count of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1).  (1-ER-293-95.)  By this time, however, defendant had absconded.  (SER-5-9 (minutes showing that defendant stopped appearing in state case).)  The government would later obtain a superseding indictment that charged defendant with possessing both firearms and ammunition.  (1-ER-286-88.)

### 4.   *Defendant is arrested after again being found with a loaded firearm hidden in his car*

Defendant remained a fugitive for approximately two years.  But on June 19, 2019, two officers spotted defendant's gold Lexus sedan in an area of Pomona, California, known for prostitution.  (1-ER-226-29; 3-ER-658.)  Defendant and a second person—who the officers suspected was a prostitute—were in the car.  (1-ER-228; 3-ER-660.)  When the officers approached, they saw defendant, who was in the driver's seat, move his hands toward the center console.  (1-ER-229; 3-ER-658.)  The officers removed defendant from the car and searched it.  (1-ER-230.)

They again found a loaded firearm in the secret compartment next to the gear shifter:



(2-ER-230-38; SER-163 (photo showing where gun was found).) DMV records confirmed that the car was the same gold Lexus sedan involved in the July 2017 incident. (1-ER-246-47.)

Following his arrest, defendant pled guilty to two felonies in state court: being a felon in possession of a firearm and carrying a concealed weapon in a vehicle. (PSR ¶ 47.) He was sentenced to 16 months in prison. (*Id.*)

### 5. *The district court denies defendant's final request for a continuance*

In January 2020, defendant made his initial appearance in this case. (CR 18.) The Federal Public Defender's Office ("FPDO") was

initially appointed to represent him.  (CR 18, 24.)  At the request of
defendant and the FPDO, the district court repeatedly continued the
trial date.  (CR 32, 34, 43, 46, 48, 52, 55.)  After seven continuances,
defendant's trial was set for August 17, 2021.  (CR 55.)

Two weeks before trial, however, defendant requested that the
district court appoint new counsel.  (CR 87.)  The district court held a
hearing on this request.  (3-ER-635-48.)  Defendant claimed that his
current attorney had not visited him for several months and generally
was not "putting her all into [his] case."  (3-ER-639-40.)  The district
court asked defendant's attorney to respond, but she claimed that the
FPDO's "policy" was "[n]ot to contradict our clients when we are in this
position."  (3-ER-642.)  The district court thus felt compelled to appoint
new counsel because the only evidence before it was defendant's
(unsubstantiated) claims about the FPDO's performance.  (3-ER-646.)

A partner from Sidley Austin LLP, an international law firm, was
appointed to represent defendant.  (SER-48.)  Two other attorneys from
the firm later joined the defense team.  (*See* 1-ER-54, 74.)  Defendant's
new attorney asked for a six-week continuance "in order to adequately
review the discovery, explore potential defenses, and secure potential

10

expert testimony that might be critical to the defense case." (SER-44.)
Defendant's attorney elaborated that this continuance was needed,
among other reasons, because the government intended to admit DNA
evidence at trial. (SER-46-47.) Defendant planned "to retain a defense
expert" who would independently review this evidence. (SER-46.) The
government did not oppose. (SER-49.)

The district court granted defendant's request in part and
continued the trial until August 31, 2021. (SER-50-52.) Eight days
before the new trial date, defendant's new attorney asked to continue
the trial another four weeks. (SER-54-59.) His application explained
that defendant had retained a DNA expert, but "additional time [was]
necessary in order to enable defendant's expert to assess and evaluate
the government's DNA testimony." (SER-55.) The government did not
oppose. (SER-59.)

The district court granted the request in full and set trial on
September 28, 2021. (1-ER-284-85.) Six days before this new trial date,
defendant requested to continue the trial by three weeks. (3-ER-629-
34.) This time, defendant's *counsel* did not represent that they needed
more time to prepare. Rather, defendant himself asked "to continue

11

this matter to October 19, 2021, to enable additional time for [defendant] to review the discovery materials in the case, to consult with defense counsel regarding those materials, and to prepare for trial." (3-ER-630.) Defendant, in particular, needed time to review "complex DNA materials." (3-ER-632.) And he argued that this request was "reasonable" because the government had recently produced a large amount of discovery. (*Id.*)

The government opposed. (SER-75-79.) As its written opposition explained, the government had "only produced approximately 200 pages over the past month." (SER-77.) Defendant also failed to explain how his personal review of "complex DNA materials"—which both sides had retained experts to analyze—would help his defense in any manner. (SER-77-78.) And perhaps most importantly, defendant ignored that his defense team was ready to proceed to trial. (SER-79.) Therefore, the circumstances suggested that defendant's request was merely for purposes of delay. (SER-78-79.)

The district court agreed and denied defendant's request in a summary order. (SER-80-81.)

### 6.     *A jury convicts defendant of being a felon in possession*

Defendant's jury trial began on September 28, 2021.  (CR 133.)

Shortly before jury selection, the court resolved the parties' motions in

limine.  (1-ER-43-58.)  Relevant here, the district court granted the

government's motion to admit the recording of A.A.'s 911 call.  (1-ER-

43-44.)  But the court concluded that one of A.A.'s statements on the

recording—"I think it was a handgun"—could not be played because

A.A. lacked "firsthand knowledge" of this fact.  (*Id.*)  The court denied

defendant's motion to exclude evidence of the 2019 arrest because it was

"admissible, as modus operandi."  (1-ER-44.)  And defendant's "motion

to exclude the DNA evidence" was also "denied."  (*Id.*)

The government began trial by presenting testimony from two

Long Beach Police Department ("LBPD") officers who responded to the

shooting on July 5, 2017.  (1-ER-158-225.)  It then introduced three

pieces of evidence that were highly probative of defendant's guilt.

### a.     *The recordings*

The government admitted two recordings during the testimony of

Officer Manny Tejeda: (1) an excerpt of the radio traffic between the

LBPD dispatcher and the officers who responded to the mobile home

park on July 5, 2017 (Exhibit 10); and the full recording of A.A.'s call to 911 (Exhibit 8).  (1-ER-159-62.)

*First*, the government admitted two minutes of the approximately 18-minute dispatch recording.  (*See* SER-24.)  This recording begins with the dispatcher conveying A.A.'s report to LBPD officers: "Our CP is advising that the suspect is her ex-girlfriend, Jasmine Russell,[2] thirty-one years old, unknown clothing.  The CP heard two shots."  (Ex. 10 at 00:20-28.)  The dispatcher later adds: "We're still trying to get further. They're advising the suspect drives a gold sedan."  (*Id.* at 00:46-49.)  An officer at the scene then contacts the dispatcher.  (*Id.* at 01:27.)  As yelling can be heard in the background, Officer Tejeda's partner reports: "We got one at gunpoint in the vehicle trying to come out.  Passenger won't put their hands up."  (*Id.* at 01:27-32.)  The recording then ends.

The government initially played the entire two-minute excerpt. (1-ER-161.)  Shortly before it was played, the district court instructed the jury that you are "about to hear communication from a dispatcher, and [ ] this evidence is admitted for the limited purpose of why Long

---

[2] Defendant was assigned female at birth, but identifies as male and uses the pronouns "he" and "him."  (AOB 1 n.1.)

Beach Police Department officers responded to the Winward Village
mobile park home on July 5th. And therefore, can only be considered
for that limited purpose." (1-ER-160.) A few minutes later, the
government re-played the portion of the recording where the officer
says, "[p]assenger won't put their hands up." (1-ER-167.)

*Second*, the government admitted the entire recording of A.A.'s
call to 911, without any limiting instruction. (1-ER-161-62.) At the
beginning of the 911 call, A.A tells the dispatcher that "somebody is
outside my house shooting." (Ex. 8 at 00:04-18.) She then goes silent
when the dispatcher asks her if she knows the identity of the shooter.
After further prompting, A.A. responds, "It is, um, my ex"—"Jasmine
Russell." (*Id.* at 00:18-42.) A.A. next gives the dispatcher information
about defendant, including his gender, race, and age. (*Id.* at 00:45-55.)
A.A. also tells the dispatcher that she heard "two" shots and defendant
was driving a "gold" car that he parked "in front of the house." (*Id.* at
01:01-40.) A.A. then abruptly hangs up the phone. (*Id.* at 01:47-49.)

Approximately 30 seconds pass before the dispatcher reaches her
again. (*Id.* at 2:32.) A.A. does not respond when asked why she hung
up. (*Id.* at 02:39-50.) The dispatcher then asks her if defendant is still

out front, to which A.A. responds, "I'm not sure." (*Id.* at 02:53-57.) In response to additional questions, A.A. says that defendant was shooting at a car in the driveway and she thought some shots hit her house. (*Id.* at 02:58-03:24.) After answering more questions about defendant, A.A. mutters "Jesus Christ" in a worried manner. (*Id.* at 04:00-04.)

A.A. then begins to cry when the dispatcher tells her that the police are there. (*Id.* at 04:20-42.) A.A. can be heard breathing loudly and crying for the next 30 seconds. (*Id.* at 04:47-05:14.) When the dispatcher asks A.A. if anyone else is there, she responds "yeah" through tears. (*Id.* at 05:12-17.) The dispatcher reminds A.A. to "just stay inside" and A.A. softly says "fuck." (*Id.* at 05:24-32.) After A.A. comments "I hear somebody's talking," the dispatcher responds that the "police are out there." (*Id.* at 06:04-09.) A.A. then ignores several questions, before telling the dispatcher: "I'm not answering because I'm trying to hear what's going on by my house." (*Id.* at 06:09-42.) She then goes silent again. (*Id.* at 06:43-7:18.)

Another individual at the house, victim U.M., gets on the phone toward the end of the call. (*Id.* at 07:25.) A.A. can be heard crying in the background as this happens. (*Id.* at 07:18-24.) U.M. confirms that

she "heard the shots." (*Id.* at 07:34-37.) U.M. and the dispatcher then struggle to communicate for around thirty seconds. (*See id.* at 07:44-08:15.) After several questions, U.M. says that "everybody's hysterical" and her "primary concern" is how "upset" everyone in the house is, adding that "[w]e just need to make sure that everybody's safe." (*Id.* at 08:15-22.) U.M. again reiterates that "right now, we just need to be like safe." (*Id.* at 08:51-54.) The call ends with U.M. telling the dispatcher that "everybody in this house is like upset" and "[e]verybody's crazy, right now." (*Id.* at 09:27-41.)

The government initially had technical issues removing the one excluded statement about the "handgun" from the recording and accompanying transcript. (*See* 1-ER-162.) Thus, there was a "fleeting" moment when the statement was "on the screen" displaying the transcript. (1-ER-248-49 (denying mistrial because the jury's exposure to this statement "was extremely short").) But a properly edited version of the recording was admitted into evidence. (*See* 2-ER-569-70.)

### b. *The 2019 arrest*

The government also introduced evidence of defendant's 2019 arrest in Pomona, California. (1-ER-225-40; SER-158-64.) One of the

arresting officers, Paul Lucifora, testified that he encountered defendant's gold Lexus sedan during a prostitution detail.  (1-ER-226-27.)  When he approached the gold Lexus, Officer Lucifora saw two people inside the car.  (1-ER-228.)  Defendant—who was in the driver's seat—began moving around.  (1-ER-229.)

The officers removed defendant from the car and conducted a search.  (1-ER-230.)  Inside the secret compartment next to the gear shifter, Officer Lucifora found a firearm.  (1-ER-236.)  He also found a bottle that contained Coumadin.  (1-ER-231-32.)  The government admitted several photographs that were taken at the scene, which showed the secret compartment.  (1-ER-228; SER-158-64.)

The parties also admitted the stipulated trial testimony of Officer Lucifora's partner, Anthony Carlevaro.  (1-ER-233-34.)  This testimony concerned the condition of the center console.  According to Officer Carlevaro, he had "attempted to remove the passenger side wall of the center console and was unable to do so" because it "still had factory screws in it."  (1-ER-233-34.)  Consequently, he concluded that "only the driver and not a passenger can conceal a firearm in the center console of

the car" because "criminals typically access the center console of cars to hide contraband through side walls of the center console."  (1-ER-234.)

During his testimony, Officer Lucifora addressed his partner's observations.  (1-ER-235-36.)  Officer Lucifora explained that, in his experience, criminals typically "access that hidden space near the center console" by "lifting the top of that center console up"—not by removing the side wall.  (1-ER-236.)  In any event, the center console in defendant's car was "approximately 8 to 12 inches wide," so "someone in the passenger seat could merely just reach over and pull up the side wall of the center console on the driver's side."  (1-ER-235-36.)

### c.    The DNA evidence

In addition, a senior criminalist from the Los Angeles Sheriff's Department, Ellen Andrews, testified about DNA evidence that was collected from the firearms and ammunition found in defendant's car. (2-ER-373-74.)  The district court qualified Andrews as "an expert on DNA analysis."  (2-ER-376-77.)

Andrews testified that she had performed DNA testing on four samples that were taken from various parts of the firearms and ammunition.  (2-ER-378.)  She had used a software program, STRmix,

to help compare these samples with defendant's DNA. (2-ER-383.)
Andrews explained that STRmix can analyze "DNA mixture[s]" that
contain "DNA from several different people"—such as the samples
collected in this case. (*Id.*) And she confirmed that STRmix is a
"reliable tool" that is "widely used by forensic laboratories." (*Id.*)

Andrews summarized the results of her testing for the jury. (2-
ER-385-89.) She found "very strong support" for the conclusion that
defendant's DNA was on both guns, while there was "limited support"
for the conclusion that his DNA was on the 9mm ammunition. (2-ER-
386-88.) Andrews testified that "very strong support" was the "highest
level of support" that her laboratory would assign to a result. (1-ER-
387.) Indeed, it was "5 times 10 to the 27th times more likely" that the
DNA sample on the 9mm handgun "originated from Jazzmon Russell
and three unknown individuals as opposed to if it originated from four
unknown individuals." (2-ER-386-87.) Andrews explained that "10 to
the 27th is a 1 with 27 zeros next to it." (2-ER-387.)

On cross-examination, defendant's attorney highlighted that there
had been a "collision event" during the testing of the reference DNA
samples that were collected from defendant. (2-ER-431-36.) As

Andrews elaborated, a plate containing some—but not all—of the reference samples hit one of the pipette "tips" during the DNA extraction process. (2-ER-432-33.) This accident had resulted in "jostling" of the reference samples on that particular plate. (2-ER-433.) Andrews, however, clarified that this "hiccup" (2-ER-431) had not impacted the results because she did not test any of the DNA samples "affected by that issue" (2-ER-440).

### d.  Verdict

Shortly after deliberations began, the jury asked to hear the two recordings again. (3-ER-626.) After around "a half day of deliberations" (2-ER-573-74), the jury then informed the district court that it was "at a stand still" (3-ER-627). The court denied defendant's request for a mistrial and instead gave an *Allen* charge:

> You have been deliberating for about a half day. That would be too soon to ever declare a mistrial on this.
>
> So we are going to send you back to continue your deliberations. If it helps, look very, very carefully at the evidence, very carefully at the instructions, and see if that helps at all as far as resolving the case.
>
> But at this time - I'm not going to be declaring a mistrial at this time. I will send you back and ask you to go over all the evidence and all the instructions and see if that helps you to resolve the case.

21

(2-ER-574-75.)

Later that day, the jury returned a guilty verdict. (2-ER-575-78.)

### 7. *The district court denies defendant's request to appoint new counsel before sentencing*

Around three weeks after trial, defendant's attorney notified the court that defendant had requested new counsel. (SER-82-84.) The district court held a hearing regarding this request in November 2021. (4-ER-700-07.)

After ordering the government to leave the room (4-ER-702), the district court asked defendant why he wanted a new attorney (4-ER-703). Defendant responded that one of the attorneys who represented him at trial had a "conflict of interest" because she previously worked for the United States Attorney's Office—and the court had "authorized the conflict." (4-ER-703-04.) He also claimed that he had been denied effective assistance of counsel. (*Id.*) Therefore, defendant asked the district court to appoint new counsel, set aside the verdict, release him on bail, and then recuse itself. (4-ER-704-05.)

The district court asked defendant's attorney if he wanted to respond. (4-ER-705.) He stated that his "ability to communicate with

the defendant here [had] been impacted . . . based on the defendant's views." (*Id.*) The court remarked that this "would be true for any attorney" because there had been similar problems "in the past." (*Id.*)

The district court then denied the motion. (4-ER-706.) As it explained, "[t]here has been a statement by the defendant of different legal princip[les] and conclusions, but nothing substantial to show that there is an inappropriate assistance of counsel and that counsel could not represent him through sentencing." (*Id.*) In sum, "[t]here's been nothing substantial that has been presented to the Court." (*Id.*)

### 8. *The district court sentences defendant to a low-end term of 120 months in prison*

The Probation Office determined that defendant's total offense level was 26 and his criminal history category was VI. (PSR ¶ 101.) That would normally result in an advisory Guidelines range of 120 to 150 months in prison. (*Id.*) Under U.S.S.G. § 5G1.1(c)(1), however, defendant's range was reduced to 120 months because that was the statutory maximum at the time. (*Id.*)[3]

---

[3] Congress has since raised the statutory maximum for 18 U.S.C. § 922(g)(1) to 15 years in prison. *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 12004, 136 Stat. 1313, 1329 (2022).

The government objected to the Probation Office's failure to apply a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B), which applies when the defendant has "used or possessed any firearm or ammunition in connection with another felony offense." (SER-85-92.) As the government explained, defendant had used the loaded firearms found in his car in connection with two felony offenses: shooting at an unoccupied vehicle and possession for sale of controlled substances. (SER-90-91.) But whatever the offense level, the government argued that a sentence of 120 months in prison was appropriate. (CR 169.)

Defendant agreed with the Probation Office's Guidelines calculations. (*See* 1-ER-14.) However, he asked the district court to impose a below-Guidelines sentence of six years in prison. (2-ER-298.) Defendant argued that this sentence was appropriate, among other reasons, because of his difficult childhood and the fact that the Sentencing Guidelines purportedly "overweight the offense level for felon-in-possession offenses." (2-ER-298-302.) He submitted both a sentencing memorandum and a letter to the court in support of this request. (2-ER-297-306.)

In March 2022, the district court held defendant's sentencing hearing. (1-ER-8-29.) Defendant's attorney reiterated that a six-year sentence was appropriate given defendant's personal history and the other circumstances of this case. (1-ER-14-16.) Defendant's attorney also objected to a proposed supervised-release condition that would have required defendant to stay away from A.A. (1-ER-17.) According to defendant, the condition was inappropriate because he was currently in a "supportive relationship" with A.A. (*Id.*)

The government asked the court to impose the supervised-release condition because the evidence at trial reflected that defendant's relationship with A.A. was "abusive," not supportive. (1-ER-17-18.) It also maintained that a 120-month sentence was appropriate because defendant had committed a serious offense in which "he actually shot the gun"; he had a long criminal history; he had not been deterred by shorter sentences; and he had absconded after he was arrested in this case. (1-ER-19-20.) Moreover, "[t]he sentencing table itself calls for a much higher guideline sentence." (1-ER-20.) Thus, there was "no reason in this case to give a below-guideline sentence." (*Id.*)

25

The district court agreed and imposed a low-end sentence of 120 months in prison. (1-ER-22.) It explained: "That is a maximum. It's a low term under the guidelines, but it's a maximum allowed." (*Id.*) The court ruled in defendant's favor on the other disputed issues: it declined to apply an enhancement under § 2K2.1(b)(6)(B) (1-ER-21), and it declined to order defendant to stay away from A.A. (1-ER-25 (ordering him to stay away only from U.M.)). After the court pronounced this sentence, defendant's attorney raised several "housekeeping" matters (1-ER-26-28), but he did not object to the district court's explanation.

## IV

## SUMMARY OF ARGUMENT

For the reasons explained below, defendant's conviction and sentence should be affirmed:

A.     The district court did not commit any evidentiary errors that require reversal. The court properly admitted the dispatch recording (Exhibit 10) and the 911 call (Exhibit 8). The admission of the 911 call did not violate the Confrontation Clause because the call's primary purpose was to respond to the "ongoing emergency" of the recent shooting. The statements of A.A. and U.M. were also admissible under

the Federal Rules of Evidence as present-sense impressions or excited utterances.

The dispatch recording was admissible for similar reasons. The officer's statement that defendant would not put his hands up was a present-sense impression made by someone responding to an ongoing emergency. And the dispatcher's statements were admissible for the limited purpose of explaining why the officers responded to the scene.

The district court also did not err by admitting evidence of the 2019 arrest. This Court has "repeatedly . . . admitted into evidence prior acts, such as the one in this case, under Rule 404(b) to show knowledge when both the prior act and the present act involved secret compartments and the defendant claimed as a defense to the crime at issue that he lacked knowledge of such a compartment." *United States v. Martinez-Alcazar*, 668 F. App'x 206, 207 (9th Cir. 2016) (collecting cases). That line of authority is on-point and controlling. Given that defendant argued he had no knowledge of the secret compartment, the government was entitled to introduce evidence that he had hidden a gun in that same compartment on another occasion.

27

Nor did the district court plainly err by declining to hold a *Daubert* hearing. This Court has squarely held that district courts are not "required to hold a '*Daubert* hearing.'" *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019). While the district court still had an obligation to make an express reliability finding, it arguably complied with that duty by qualifying Andrews as a DNA expert during her testimony. Regardless, any error was harmless because the record shows that the government's DNA testimony was admissible.

B.    The district court did not abuse its discretion by giving the jury an *Allen* charge. "This court must uphold the district court's decision unless the record makes it clear that the *Allen* charge had a coercive effect on the jury." *United States v. Daas*, 198 F.3d 1167, 1179 (9th Cir. 1999). Defendant cannot show a coercive effect because the form of the instruction was neutral; the timing of the verdict does not suggest coercion; and none of the other usual indicators of coercion, such as the judge inquiring into the nature of the split or mentioning the cost of a retrial, were present.

C.    Sufficient evidence supports defendant's conviction for being a felon in possession. The evidence showed that defendant's ex-

girlfriend A.A. told a 911 dispatcher that he was "outside [her] house shooting"; defendant was found near the scene of the shooting; defendant spent several minutes with his hands by the center console; defendant had hidden a gun in the same car's secret compartment on a different occasion; his DNA was on the guns; and his prescription medication was also in the secret compartment. That evidence was more than enough for a reasonable jury to convict defendant.

D.    The district court did not abuse its discretion by declining to grant defendant's final request for a continuance. The record does not support defendant's claims that he needed more time to personally review the discovery or that the denial of a continuance harmed him. Defendant also ignores that his counsel was ready for trial. As the Supreme Court has said, it is "far from an abuse of discretion to deny a continuance" when defense counsel is ready to proceed but a defendant personally requests more time. *Morris v. Slappy*, 461 U.S. 1, 12 (1983).

E.    The district court did not abuse its discretion by declining to appoint new counsel before sentencing. Defendant's unhappiness with his attorney's performance, and his recent conviction, was not a basis to appoint new counsel, particularly since he had previously requested

new counsel based on similar complaints.  Moreover, defendant's ability to work with his attorney in preparing for sentencing demonstrates that the conflict was not so extensive as to require substitution.

F.    The district court did not commit any errors in imposing defendant's sentence.  A district court does not err when it "listens to the defendants' arguments and then simply finds the circumstances insufficient to warrant" the requested sentence.  *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1053-54 (9th Cir. 2009) (cleaned up). That is what happened here.  The district court carefully listened to defendant's sentencing arguments and ruled in his favor on several points, but agreed with the government that a below-Guidelines sentence was inappropriate.  The court did not clearly or obviously err by not saying more.  In any event, defendant has made no attempt to show that the court's purported error affected the length of his sentence or the fairness, integrity, or public reputation of the proceedings.

Defendant's low-end sentence was also substantively reasonable. Defendant complains that a lower sentence was appropriate because of certain mitigating factors.  But "the weight to be given the various factors in a particular case is for the discretion of the district court."

*United States v. Gutierrez-Sanchez*, 587 F.3d 904, 909 (9th Cir. 2009).

The district court reasonably concluded that the aggravating factors in

this case—including the serious nature of the offense and defendant's

long criminal history—called for a Guidelines sentence.  That was not a

clear error of judgment.

## V

## ARGUMENT

### A.    The District Court Did Not Commit Any Evidentiary Errors that Warrant Reversal

#### 1.    *Standard of review*

A district court's decision to admit evidence is reviewed for abuse

of discretion.  *See United States v. Alvirez*, 831 F.3d 1115, 1120 (9th Cir.

2016).  "The abuse of discretion standard is highly deferential to the

trial court."  *United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir.

1993).  Under this standard of review, this Court "cannot simply

substitute [its] judgment for that of the district court, but must be left

with the definite and firm conviction that the court committed a clear

error of judgment in reaching its conclusion after weighing the relevant

factors."  *Id.* (quotation marks omitted).

Because defendant did not request a *Daubert* hearing, his challenge to the DNA evidence is reviewed for plain error. *See United States v. Alatorre*, 222 F.3d 1098, 1104 n.7 (9th Cir. 2000). Defendant also concedes that his Confrontation Clause claim is reviewed for plain error because he did not raise it below. (AOB 33.) To establish plain error, defendant has the burden to show (1) error, (2) that was clear or obvious, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Greer v. United States*, 141 S. Ct. 2090, 2096-97 (2021).

## 2. *Both recordings were properly admitted*

Defendant first argues that the district court erred by admitting two recordings: (1) the excerpt of the radio traffic between the LBPD dispatcher and the responding officers; and (2) the full recording of the 911 call. (AOB 36-49.) That claim fails for multiple reasons.

As a threshold matter, defendant misunderstands the district court's limiting instruction. He suggests that the court admitted the entirety of both recordings solely for the "limited purpose" of why the LBPD officers responded to the mobile home park. (AOB 41-43.) That is not accurate. The district court admitted only the statements of the

LBPD dispatcher on the first recording—Exhibit 10—for this limited purpose. That is why this instruction was given only before the government played the entirety of Exhibit 10, and not again before it played the 911 recording (Exhibit 8) or the clip of Exhibit 10 that featured the officer's statements. (*Compare* 1-ER-160, *with* 1-ER-161-62, *and* 1-ER-167.) And that is why the district court instructed the jury that it was about to "hear communication from a dispatcher . . . [that] can only be considered for [a] limited purpose" (1-ER-160)—not communications from a police officer or 911 caller.

In any event, the district court properly admitted both recordings for the reasons explained below. To the extent that the court gave an "unnecessar[ily] [broad] limiting instruction," that does not impact the analysis. *United States v. Gonzales*, 307 F.3d 906, 910-11 (9th Cir. 2002) (concluding that the district court did not err by admitting certain items of evidence that "were admissible on their own merits," even though the court gave "an unnecessary limiting instruction").

### a.    *The 911 call*

The district court properly admitted the entirety of the 911 call. To start, the Confrontation Clause did not bar admission of this call.

The Confrontation Clause applies only to "testimonial" evidence; that is, evidence that is the functional equivalent of testimony. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The Supreme Court has applied that standard to a 911 call similar to the one at issue here. In *Davis v. Washington*, 547 U.S. 813 (2006), the Court held that statements made by a 911 caller—who was also reporting a domestic violence incident—were nontestimonial because "a 911 call is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827 (cleaned up). The Court described a number of circumstances that rendered the caller's statements distinct from "testimony," including that the caller was describing events as they were occurring; the caller was "facing an ongoing emergency"; the statements were necessary to resolve this emergency; and the lack of formality. *Id.* at 827-28. The totality of these circumstances indicated that the 911 call's "primary purpose was to enable police assistance to meet an ongoing emergency." *Id.*

The primary purpose of A.A.'s 911 call was also to enable the police to respond to an ongoing emergency. As in *Davis*, A.A. and U.M. described events to the 911 dispatcher as they were occurring, including

that the shooting had just happened, A.A. could hear the police outside, and U.M. was trying to make sure everyone was safe; their statements were necessary to resolve the ongoing emergency, as they provided information to the dispatcher about defendant and what was happening at the house; and the call lacked any formality, as evidenced by A.A.'s repeated crying and U.M.'s statements about how "upset" and "crazy" they were feeling.  Consequently, their statements were not testimonial.

Defendant responds that "parts of the call" were inadmissible because they "took place after the officers had located and stopped Defendant's car." (AOB 43-44.)  But the emergency did not end just because the police had located defendant.  As this Court has explained, "there can be an ongoing emergency even after the original threat to a victim has ceased to exist, so long as there is a threat potentially to the police and the public." *United States v. Solorio*, 669 F.3d 943, 952 (9th Cir. 2012) (cleaned up).  In *Michigan v. Bryant*, for instance, the Supreme Court held that statements made by a shooting victim to the police about 25 minutes after he had been shot were not testimonial. 562 U.S. 344, 377 (2011).  Although the threat to the "first victim" was

"neutralized," the shooter continued to pose a "threat to the first responders and public." *Id.* at 363-64.

The same was true here. Even assuming that defendant no longer posed a threat to A.A. or U.M. by the end of the call, he posed a threat to the responding officers because he remained in possession of two loaded firearms and refused to put his hands up for "[a]pproximately ten minutes" after the officers arrived. (1-ER-167.) And given that the 911 call lasted less than ten minutes—and was made shortly after the shots were fired (*see* Ex. 8 at 00:15-42 (A.A. telling the dispatcher that defendant was currently outside "shooting"))—that means defendant was still in the car, with his hands concealed, at the time that the 911 call ended. Thus, there remained an "ongoing emergency" when U.M. hung up the phone. At minimum, it is not clear or obvious that the emergency had ended by that point. *See United States v. Yijun Zhou*, 838 F.3d 1007, 1011 (9th Cir. 2016) ("[A]n error that hinges on a factual dispute is not 'obvious' as required by the 'plain error' standard.").

Defendant also generally argues that the district court failed to carefully review the 911 call to see if there were any testimonial "parts of the call" that needed to be redacted or excluded. (AOB 43.) In fact,

the court did exclude A.A.'s statement, "I think it was a handgun." (1-ER-43.) And contrary to his claim (AOB 44), the government admitted a properly edited version of the recording into evidence (2-ER-569-70). What's more, defendant himself fails to identify which "parts of the call" should have been redacted. (AOB 43.) This Court should decline to "manufacture" such a partial exclusion argument for him. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

Defendant's hearsay arguments are similarly unpersuasive. The statements of A.A. and U.M. were admissible as both present-sense impressions under Rule 803(1) and excited utterances under Rule 803(2). As this Court has recognized, "a statement by a 911 caller who is witnessing the violent arrest of a suspect by the police"—or making a call "immediately following a shooting"—"could qualify under either exception." *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995).

These exceptions apply because, contrary to defendant's claims, both A.A. and U.M. had "personal knowledge" that "Russell had shot a gun." (AOB 44.) "Personal knowledge means knowledge produced by the direct involvement of the senses." *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014); *see also United States v. Portsmouth Paving*

37

*Corp.*, 694 F.2d 312, 323 (4th Cir. 1982) (for purposes of present-sense impression, "[w]e perceive events with our ears as much as with our eyes"). Both A.A. and U.M. told the dispatcher that they *heard* two gunshots. (Ex. 8 at 00:15-42; *id.* at 07:34-37.) And they had personal knowledge that defendant was the shooter because they *heard* him threatening A.A.—around 3 a.m. when no one else was around—just a minute before the shots. (PSR ¶ 5; 2-ER-322.) *See United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) ("Personal knowledge includes opinions and inferences grounded in observations and experience." (cleaned up)). That was sufficient personal knowledge to admit the statements of both A.A. and U.M. *See United States v. Steele*, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (admitting a 911 call where the caller saw a man point a gun at another man, went inside, and then "heard what sounded like a gunshot"). Defendant's claim regarding the purportedly limited "extent" of their "opportunity to observe [him] goes to the weight of" the recording, "not to its admissibility." *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005).

A.A. and U.M. also displayed the "emotion" required for their statements to qualify as excited utterances. (AOB 45 n.7.) Defendant's

38

assertion otherwise is flatly inconsistent with the recording: A.A. can be heard crying and yelling throughout the call, and U.M. ended it by stating that "everybody in this house is like upset." (Ex. 8 at 09:27-41.) And to the extent that A.A. may have sounded sullen at points, the fact that she was "a domestic violence victim . . . could have impacted her reaction." *United States v. Lundy*, 83 F.4th 615, 620 (6th Cir. 2023).

### b. *The dispatch recording*

The district court also properly admitted the dispatch recording. As a general matter, out-of-court statements may be admitted to "explain why an officer conducted an investigation as he did," if a proper limiting instruction is given. *United States v. Cawley*, 630 F.2d 1345, 1350 (9th Cir. 1980); *see also Suggs v. Stanley*, 324 F.3d 672, 681-82 (8th Cir. 2003). Here, the dispatcher's statements, which relayed a small portion of the 911 call, were properly admitted for the limited purpose of explaining why the officers responded to the mobile home park. Defendant responds that "no hearsay exception" applied to these statements (AOB 45), but that is beside the point. The statements were not hearsay at all because the government did not offer them "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2).

By contrast, the statements made by Officer Tejeda's partner—
"We got one at gunpoint in the vehicle trying to come out.  Passenger
won't put their hands up"—were offered for their truth, but were
properly admitted under Rule 803(1).  Statements made by law
enforcement officers who are "providing a description of the events at
the same time they were witnessing them" are admissible as present-
sense impressions.  *United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir.
1995).  And the admission of such statements does not violate the
Confrontation Clause when, as here, the declarant is responding to a
"high-risk situation" or "ongoing emergency."  *Solorio*, 669 F.3d at 953-
54.  Defendant simply ignores this controlling authority.

### c.    *Rule 403*

Finally, neither recording should have been excluded under Rule
403 because neither is "deeply and unfairly prejudicial."  (AOB 48.)
Rule 403 does not preclude evidence merely because it is prejudicial—
only evidence that is unfairly prejudicial must be excluded.  *See United
States v. Booth*, 669 F.2d 1231, 1240 (9th Cir. 1981).  And in a criminal
case, exclusion under Rule 403 is "an extraordinary remedy to be used
sparingly."  *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995).

In this case, there was nothing *unfair* about admitting evidence that defendant discharged a gun shortly before two loaded firearms were found in his car.  He highlights that this evidence bolstered Officer Tejeda's testimony and that the jury thought it was important (AOB 48), but that merely demonstrates the recordings were prejudicial to his case—not unfairly so.  Defendant also complains that the recordings portrayed him as "a violent individual."  (AOB 48.)  This Court, however, previously held that evidence of "an eleven hour shoot-out with San Diego police officers" was not barred by Rule 403 because it "was sufficiently intertwined with the evidence regarding [a felon in] possession charge."  *United States v. Daly*, 974 F.2d 1215, 1216-17 (9th Cir. 1992).  Rather, the government properly relied upon this shoot-out to put the defendant's "illegal conduct into context" and to prove that he had illegally possessed a gun.  *Id.* at 1216.

The same reasoning applies here.  The government properly relied upon the shooting—which was less salacious than a long shoot-out with the police—to put defendant's actions in context and to prove that he possessed a gun.  While this evidence may have been prejudicial to defendant's case, it was not unfairly so.

41

### 3.  *Evidence of the 2019 arrest was properly admitted*

Defendant next argues that the district court erred by admitting evidence of his 2019 arrest under Rule 404(b).  (AOB 49-53.)  Again, he fails to establish that the district court erred, much less that it abused its discretion.

This Court has "repeatedly . . . admitted into evidence prior acts, such as the one in this case, under Rule 404(b) to show knowledge when both the prior act and the present act involved secret compartments and the defendant claimed as a defense to the crime at issue that he lacked knowledge of such a compartment." *United States v. Martinez-Alcazar*, 668 F. App'x 206, 207 (9th Cir. 2016) (collecting cases).  In *United States v. Bibo-Rodriguez*, for instance, the government properly admitted evidence that Bibo-Rodriguez had previously transported drugs across the border "hidden" in a secret compartment in his car to prove his knowledge of drugs—also hidden in a secret compartment in his car—when he was caught a second time.  922 F.2d 1398, 1402 (9th Cir. 1991).  "The evidence of the December marijuana transaction indicated that Bibo-Rodriguez was not duped during the September transaction and therefore he must have known that he was carrying cocaine." *Id.*; *see*

42

*also United States v. Rubio-Villareal*, 927 F.2d 1495, 1503 (9th Cir. 1991) (holding that the district court did not err by admitting similar evidence given "striking" similarities between two smuggling incidents).

That line of authority is on-point and controlling. Defendant argued at trial that he had no knowledge of the secret compartment next to the gear shifter—at least in 2017. (*See* 1-ER-152 (opening statement); 2-ER-499 (closing statement).) The government was entitled to rebut this defense by admitting evidence that defendant had hidden a firearm in that same compartment on a different occasion. This evidence showed that defendant "must have known that he was carrying" the firearms in this case. *Bibo-Rodriguez*, 922 F.2d at 1402. And the "striking" similarities between the two incidents made the probative value of the evidence "high." *Rubio-Villareal*, 927 F.2d at 1503. Ultimately, "the fact that [defendant] knowingly possessed a firearm in a car on a previous occasion ma[de] it more likely that he *knowingly* did so this time as well, and not because of accident or mistake." *United States v. Jernigan*, 341 F.3d 1273, 1282 (11th Cir. 2003), *abrogated on other grounds by Rehaif v. United State*s, 139 S. Ct. 2191 (2019); *see also United States v. Moorhead*, 57 F.3d 875, 888 (9th

Cir. 1995) (affirming admission of evidence that the defendant had been seen "with a gun on prior occasions" to rebut his defense that a gun found in his car did not belong to him).[4]

Defendant's objections to this straightforward conclusion are not persuasive. To begin, he is wrong that Rule 404(b) only permits the admission of a "*prior* act," not "*subsequent* acts." (AOB 51.) This Court has "squarely resolved in the government's favor the issue that subsequent Rule 404(b) evidence may be relevant and admissible." *United States v. Hinostroza*, 297 F.3d 924, 928 (9th Cir. 2002); *accord United States v. Lloyd*, 807 F.3d 1128, 1157 (9th Cir. 2015). His claim that there were "significant differences" between the incidents is similarly unavailing. (AOB 50-51.) In both 2017 and 2019, defendant was (1) found with a loaded firearm in his car; (2) hidden in the same secret compartment; (3) next to tablets of Coumadin. Indeed, the photographs from these arrests look almost identical:

---

[4] Contrary to defendant's suggestion (AOB 51), these cases are consistent with *United States v. Rendon-Duarte*, 490 F.3d 1142, 1143-44 (9th Cir. 2007). Unlike defendant (PSR ¶ 47), Rendon-Duarte was not arrested or convicted of illegal firearms possession based on the prior incidents where guns were found in his car. *See Rendon-Duarte* ARB at 1-2, 2006 WL 3225585.

2017 Arrest
Photo of gun in compartment

2019 Arrest
Photo of where gun was hidden




(SER-131, 163.)

Although defendant argues that the incidents were dissimilar because they involved "different guns" (AOB 51), this Court's case law has never required that level of similarity. In *Bibo-Rodriguez* and *Rubio-Villareal*, for example, the evidence of the prior drug-smuggling incident was admissible even though the defendant was not caught again with the *same drugs*. And there were, in fact, marked similarities between the guns recovered in 2017 and 2019. On both occasions, defendant hid a loaded .38 caliber revolver in the secret compartment (2-ER-322; 3-ER-662-63), and both revolvers were stolen from the same person (3-ER-651).

It is equally irrelevant that defendant was a passenger in 2017 and the driver in 2019. (AOB 51-52.) As Officer Lucifora explained, defendant could have accessed the secret compartment from the passenger's seat by lifting up the center console or reaching across it. (1-ER-235-36.) And Rule 404(b) does not require that a defendant's "past conduct be identical to the conduct charged." *United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997). That is because "Rule 404(b) has . . . long been characterized as a rule of inclusion—not exclusion." *United States v. Bailey*, 696 F.3d 794, 806 (9th Cir. 2012) (quotation marks omitted).

Defendant also fails to establish that evidence of the 2019 arrest should have been excluded under Rule 403. (AOB 52.) Again, there is an important distinction between prejudicial evidence and *unfairly* prejudicial evidence. *See United States v. Parker*, 549 F.2d 1217, 1222 (9th Cir. 1977) (explaining that Rule 404(b) evidence "is not rendered inadmissible because it is of a highly prejudicial nature . . . . The best evidence often is." (quotation marks omitted)). Evidence of the 2019 arrest was highly probative because it rebutted defendant's claim that he lacked knowledge of the secret compartment. And nothing about the

46

2019 arrest made it so likely to incite or distract the jury as to make it inadmissible. Indeed, this Court has previously upheld the admission of considerably more distracting Rule 404(b) evidence. *See, e.g.*, *United States v. Hadley*, 918 F.2d 848, 851 (9th Cir. 1990) (affirming admission of prior instances of molestation in a sexual abuse case); *United States v. Boise*, 916 F.2d 497, 502 (9th Cir. 1990) (affirming admission of evidence of child abuse in a murder case).

Furthermore, the district court mitigated the danger of any unfair prejudice by giving an appropriate limiting instruction. *See Rubio-Villareal*, 927 F.3d at 1503 (concluding that evidence was admissible under Rule 403 because "the need for the evidence was high" and "the judge gave very careful limiting instructions"). Defendant complains that the district court did not tell the jury that it could not consider this evidence "as a substitute for proof that the defendant committed the crimes charged" or "as proof that the defendant has a bad character or any propensity to commit crimes." (AOB 52-53.) But defendant appears to ignore the full instruction given by the district court:

> The defendant is not on trial for any other conduct or offense not charged in this indictment.

You have heard evidence that the defendant committed other acts not charged in this indictment. You may consider that evidence only for its bearing or not, if any, on the question of the defendant's intent, plan, knowledge, absence of mistake or absence of accident and for no -- excuse me. And for no other purpose.

(2-ER-526.) The jury is presumed to have followed this instruction to consider the 2019 arrest "for no other purpose." *See United States v. Olano*, 507 U.S. 725, 740 (1993). Therefore, the district court did not abuse its "wide discretion in deciding to admit evidence under Rule 404(b)." *United States v. Feldman*, 788 F.2d 544, 557 (9th Cir. 1986).[5]

### 4. *The district court did not plainly err by declining to hold a* Daubert *hearing*

The district court also did not err, let alone plainly err, in admitting DNA evidence without a *Daubert* hearing when defendant never requested one. (AOB 53-55.)

District courts "are vested with broad latitude to decide how to test an expert's reliability." *United States v. Ruvalcaba-Garcia*, 923

---

[5] To the extent defendant suggests that the district court erred by not conducting an express Rule 403 analysis on the record (AOB 53), that claim also fails. The court "implicitly made the necessary finding" by reviewing the parties' filings and denying defendant's motion in limine. *See United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992).

F.3d 1183, 1189 (9th Cir. 2019) (quotation marks omitted). "Although *Daubert* identifies several factors that may be used for evaluating the reliability of an expert," "district courts are not required to consider all (or even any) of these factors, nor are they required to hold a '*Daubert* hearing.'" *Id.* (quotation marks omitted). Among other options, a district court may instead allow the defendant's attorney "to explore [the expert]'s qualifications and the basis for his testimony at trial." *United States v. Alatorre*, 222 F.3d 1098, 1104 (9th Cir. 2000); *see also United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014).

That is what the district court did here. While it did not hold a formal *Daubert* hearing, the district court allowed defendant's attorney to cross-examine the government's expert about her qualifications (2-ER-390-91), her experience (2-ER-392-94), and her use of STRmix to perform the DNA testing in this case (2-ER-397-422). In other words, the district court gave defendant's attorney a fulsome opportunity "to explore [the expert]'s qualifications and the basis for [her] testimony at trial." *Alatorre*, 222 F.3d at 1104.

To be sure, the district court also had an obligation to "make a specific finding as to whether the expert testimony was reliable." (AOB

49

53.)  But it is not clear or obvious that the court ignored this duty.  After the government questioned Andrews about her qualifications, it moved to qualify her "as an expert on DNA analysis."  (2-ER-376.)  The district court responded, "She qualifies."  (2-ER-377.)  Defendant fails to cite any cases establishing—in a clear or obvious manner—that this brief statement was insufficient.  *Compare Ruvalcaba-Garcia*, 923 F.3d at 1190-91 (concluding that the district court abused its discretion because it rejected multiple requests to qualify the witness as an expert), *with United States v. James*, 2021 WL 4027812, at *1 (9th Cir. 2021) (unpublished) (concluding that the district court's brief statement that the expert "can offer reliable and relevant testimony" was sufficient).

In any event, defendant cannot establish any impact upon his substantial rights because the district court's purported error was harmless.  "When the record shows that the expert's testimony satisfied the requirements for admission, we may conclude that the district court's failure to make an explicit finding of reliability was harmless."  *Ruvalcaba-Garcia*, 923 F.3d at 1190 (quotation marks omitted).  Here, defendant does not dispute that Andrews was qualified to offer expert testimony on DNA testing.  Nor does he claim that the "STRmix

50

method" of DNA testing is generally unreliable. (AOB 54.) Instead, defendant claims that an explicit reliability finding was needed only because—in this particular case—a "collision" impacted the application of STRmix. (AOB 54-55.)

That claim, however, misunderstands both the facts and the law. Andrews testified unequivocally that the "collision" did not impact her results because she "didn't analyze any of the DNA affected by that issue." (2-ER-440.) She simply disregarded the reference samples that were "jostled" by the collision. (*Id.*) And regardless, this issue had no bearing on the *admissibility* of the government's DNA evidence. This Court has squarely, and repeatedly, held that "the impact of imperfectly conducted laboratory procedures is better approached as an issue going not to the admissibility, but to the weight of the DNA profiling evidence." *United States v. Hicks*, 103 F.3d 837, 846 (9th Cir. 1996) (quotation marks omitted), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc); *accord United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014)

(en banc).  In other words, defendant's claim regarding the collision goes
to the weight of the DNA evidence—not its admissibility.

What's more, defendant cannot satisfy the fourth prong of plain-
error review.  In the district court, defendant filed a written objection to
the government's DNA evidence, but he never requested a *Daubert*
hearing.  (SER-71-74.)  He also declined to request an explicit reliability
finding before or during trial.  Rather, he was apparently satisfied with
cross-examining Andrews.  (2-ER-431-36.)  Given his decision to raise
certain challenges to the DNA evidence—but not the challenges pressed
on appeal—"[r]eversal under these circumstances would come close to
rewarding the type of sandbagging that plain error review seeks to
avoid."  *United States v. Hougen*, 76 F.4th 805, 812 (9th Cir. 2023).

### 5.   *Any error was harmless*

Even if the district court erred in admitting some of the evidence
discussed above, the error was harmless.  An evidentiary error does not
require reversal if "there is a 'fair assurance' of harmlessness or, stated
otherwise, . . . it is more probable than not that the error did not
materially affect the verdict."  *United States v. Morales*, 108 F.3d 1031,
1040 (9th Cir. 1997) (en banc).  The government can satisfy that

standard where the relevant evidence was "redundant," *United States v. Redlightning*, 624 F.3d 1090, 1116 (9th Cir. 2010), or "the properly admitted evidence was highly persuasive and overwhelmingly pointed to guilt," *United States v. Bailey*, 696 F.3d 794, 804 (9th Cir. 2012).

In this case, the government presented overwhelming evidence of defendant's guilt, which included the testimony of two LBPD officers, the two recordings, evidence of the 2019 arrest, and the DNA evidence. Even if some of this evidence was erroneously admitted, the remaining evidence was highly persuasive and overwhelmingly pointed to guilt. In particular, any error in admitting the dispatch recording was clearly harmless because the dispatcher's statements regarding the 911 call were cumulative of the recording of the call itself, while the officer's statements were cumulative of Officer Tejeda's testimony. Accordingly, this Court should conclude that the evidentiary errors committed by the district court, if any, were harmless.

## B.    The District Court's *Allen* Charge Was Appropriate

### 1.    *Standard of review*

The district court's decision to give an *Allen* charge is reviewed for abuse of discretion. *United States v. Daas*, 198 F.3d 1167, 1179 (9th

53

Cir. 1999). "This court must uphold the district court's decision unless the record makes it clear that the *Allen* charge had a coercive effect on the jury." *Id.*

### 2. The district court's instruction did not coerce the jury

Defendant is incorrect that the *Allen* charge improperly coerced the jury to return a guilty verdict. (AOB 56-58.) In assessing the coerciveness of an *Allen* charge, "this court evaluates three things: (1) the form of the instruction, (2) the time the jury deliberated after receiving the charge as compared to the total time of deliberation, and (3) any other indicia of coerciveness." *Daas*, 198 F.3d at 1179-80. None of these factors supports defendant's claim.

*First*, the form of the *Allen* charge was not coercive. While defendant stresses that the district court did not rely upon the relevant model jury instruction (AOB 57), "district judges are not required to give model jury instructions," *United States v. Vallejo*, 237 F.3d 1008, 1025 n.8 (9th Cir. 2001). And the form of the *Allen* charge here was not coercive. Rather, the district court simply told the jury that it was "too soon" to declare a mistrial and asked them to "look very, very carefully at the evidence, very carefully at the instructions, and see if that helps

54

at all as far as resolving the case."  (2-ER-575.)

Defendant's sole complaint is that the district court did not "remind them that they should not change their minds simply to arrive at a verdict."  (AOB 58.)  The court, however, had already given the jurors this instruction at the close of trial.  (*See* 2-ER-530 ("But do not come to a decision simply because the other jurors think it is right.").)  There is no reason to think that the jurors ignored this instruction because of the *Allen* charge, which specifically told them to look "very carefully at the instructions" that had already been given.  (2-ER-575.)

*Second*, the timing does not reflect coercion.  The jury deliberated for around "a half day" before the *Allen* charge (2-ER-574), and then returned a verdict a few hours later (*see* 2-ER-575-76 (noting that the parties were ordered to return around "3:30 this afternoon").)  This Court has recognized that similar timing does not indicate coercion.  *See Daas*, 198 F.3d at 1180 (holding that there was no coercion where "[t]he total time the jury deliberated was between four-and-a-half and five hours, one hour of which followed the *Allen* charge").  And defendant is wrong that "[t]he jury had already deliberated . . . for almost as long as the evidentiary portion of the trial" at the time that the *Allen* charge

55

was given.  (AOB 57.)  In reality, the "evidentiary portion" of the trial

took more than a day, while the jury deliberated for only "a half day"

before the *Allen* charge.

*Third*, there is no other evidence of coercion.  To the contrary, the

records contains "none of the elements that have constituted the usual

indicia of coercion in prior cases."  *United States v. Hernandez*, 105 F.3d

1330, 1333 (9th Cir. 1997) (quotation marks omitted).  The district

court, for instance, "did not know the numerical division of the jury."

*Id.* at 1334 (quoting *United States v. Easter*, 66 F.3d 1018, 1023 (9th

Cir. 1995)).  Thus, "no juror in this case had any reason to believe that

the charge was being leveled at her, or even that the charge was aimed

at jurors on one side or the other."  *Id.*  And while "the district court

noted the possibility of retrial should the jury not reach a verdict," "the

instruction did not mention the expense that would be incurred by the

Government and the defense in the event of a retrial."  *Id.*

As a result, the *Allen* charge must be upheld because it is far from

"clear" that it had a coercive effect.  *See Daas*, 198 F.3d at 1179.

**C.     Sufficient Evidence Supports Defendant's Conviction**

*1.     Standard of review*

This Court uses a two-step inquiry for preserved sufficiency-of-the-evidence challenges. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  First, the Court "must consider the evidence presented at trial in the light most favorable to the prosecution." *Id.* "This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences or considered the evidence at trial." *Id.*  Second, "after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *Id.* (alteration adopted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  At this step, "a reviewing court may not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,' only whether '*any*' rational trier of fact could have made that finding." *Id.* (citations omitted) (quoting *Jackson*, 443 U.S. at 318-19).  Under this deferential standard, reversal is reserved for "rare occasions." *Id.*

### 2. The government presented ample evidence of defendant's guilt

The evidence was more than sufficient to support defendant's conviction for being a felon in possession. (AOB 59-61.) In resisting this conclusion, defendant ignores the applicable standard, as well as the evidence.

To begin, the evidence presented at trial was not "[t]hin." (AOB 59.) While defendant is correct that no one saw him holding a gun, the government presented evidence showing that: (1) A.A. called 911 and said that defendant was "outside [her] house shooting"; (2) defendant's car was stopped shortly after the shooting; (3) defendant refused to put his hands up for approximately ten minutes and instead had them by the center console; (4) two loaded firearms were then found in a secret compartment in the center console; (5) his prescription medication was found in the same compartment; (6) defendant had hidden a firearm in that same compartment on a different occasion; and (7) defendant's DNA was on the firearms. A rational jury could have readily convicted defendant based on that evidence.

Defendant responds by improperly asking this Court to view the evidence in the light most favorable to him. (AOB 60.) For instance,

defendant argues that the DNA evidence had no value because the government's expert "could not confirm whether the DNA was the result of Russell handling the guns, or simply a function of the guns being in his car." (*Id.*) Similarly, defendant argues that Officer Tejeda's testimony about defendant's hands being near the center console should be disregarded because "the windows were up and tinted thus undercutting his claim that he could hear and see into the car." (*Id.*) And defendant argues that the 2019 arrest "says nothing about" his knowledge of the secret compartment in 2017 because "he could not easily access" the compartment "as a passenger." (*Id.*)

A rational jury, however, could have concluded that defendant's DNA was found on the guns because he handled them and had just committed a shooting—not because of inadvertent transfer or a lab accident. A rational jury could have also concluded that Officer Tejeda saw defendant's hands even if the windows were up and tinted—or that the tinting occurred after the shooting. (1-ER-188; *see also* 1-ER-194-95 (Officer Thai testifying that he was able to see two people "inside that gold Lexus" when he arrived on the scene).) And a rational jury could have concluded that the 2019 arrest was highly probative of defendant's

knowledge in 2017 because it involved the same secret compartment—
which, according to Officer Lucifora, defendant could have easily
accessed as a passenger. (1-ER-235-36.) When the evidence is properly
viewed in this light, it is plain that a rational jury could have convicted
defendant. *See Nevils*, 598 F.3d at 1164.

Defendant also argues that the purportedly "cumulative nature of
the errors" made by the district court supports his sufficiency claim.
(AOB 60-61.) That argument misunderstands this Court's inquiry. In
assessing sufficiency, this Court "must consider all of the evidence
admitted by the trial court, regardless of whether that evidence was
admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010)
(quotation marks omitted). If the evidence was sufficient to support
defendant's conviction only due to improperly admitted evidence, the
remedy is a new trial—not acquittal. *Lockhart v. Nelson*, 488 U.S. 33,
40 (1988); *see also United States v. Preston*, 751 F.3d 1008, 1029 (9th
Cir. 2014) (en banc).

In any event, the doctrine of cumulative error does not apply here
because defendant has not established that the district court committed
any errors. *See Solorio*, 669 F.3d at 956. And even if the district court

did commit more than one error, reversal is not warranted in light of
the overwhelming evidence of defendant's guilt. *See Lloyd*, 807 F.3d at
1169 (holding that multiple errors did not require reversal "[i]n light of
the overwhelming admissible evidence").

## D. The District Court Properly Denied Defendant's Final Request for a Continuance

### 1. *Standard of review*

A district court's denial of a request for a continuance is reviewed
for abuse of discretion. *United States v. Audette*, 923 F.3d 1227, 1240
(9th Cir. 2019). "A court does not abuse its discretion unless the denial
of a continuance was arbitrary or unreasonable." *Id.* (quotation marks
omitted). "Most critical" to that determination is whether the defendant
"was harmed" by the denial. *Id.* (cleaned up).

### 2. *Defendant failed to establish a basis for a tenth continuance on the eve of trial*

The district court did not abuse its discretion by denying
defendant's final request for continuance. (AOB 61-64.) The record
wholly supports that decision.

Defendant requested the final continuance because he needed
"additional time . . . to review the discovery materials in this case." (3-
ER-630.) The government, however, had produced only 200 pages of

new discovery over the preceding month, and defendant had already been given nearly *20 months* to review the entire—relatively small—universe of relevant discovery. (*See* SER-77.) Defendant's application also did not explain how this additional review would aid his defense. And critically, defendant's counsel did not represent that they needed more time to prepare for trial—only defendant did. (*See* SER-79.) Thus, the district court properly denied this request for yet another continuance (which would have been the tenth overall) because the circumstances indicated that it was for purposes of delay. *See United States v. Walter-Eze*, 869 F.3d 891, 908 (9th Cir. 2017) (recognizing that a continuance may be denied for this reason)

Defendant responds by claiming that his "counsel was diligent despite difficult circumstances" and needed more time to prepare for various reasons. (AOB 62-63.) But that claim mischaracterizes the nature of his request. Defendant's counsel—which consisted of three attorneys from Sidley Austin LLP—never represented that they needed more time to prepare for trial. In contrast to past applications, this application was clear that "Russell," not defense counsel, needed more time to review the discovery. (*Compare* 3-ER-630, *with* SER-44.) And

as the Supreme Court has instructed, it is "far from an abuse of discretion to deny a continuance" when defense counsel is ready to proceed, but the defendant personally requests more time. *Morris v. Slappy*, 461 U.S. 1, 12 (1983). Indeed, it would be "remarkable" for a district court to grant a continuance in such circumstances. *See id.*

Defendant also fails to establish that the district court's decision harmed him. He suggests that the "looming trial date" prevented him from filing additional motions and preparing for trial in various ways. (AOB 63-64.) The district court, however, granted his sole request to file a motion after "the court cut off motions in limine" (AOB 63). (1-ER-281-82.) Nothing in the record indicates that his counsel needed more time "to get up to speed" on the government's DNA evidence (AOB 64), as demonstrated by the lengthy cross-examination of Andrews. And defendant fails to offer any support for his claim that he decided not to call any witnesses due to time constraints (*id.*)—rather than strategy.

Defendant's assertion that he needed more time to personally review discovery because "he, not his counsel, was present" for the key events (AOB 63) is similarly unsupported. Defendant does not dispute that the government produced only 200 pages of discovery during the

month preceding trial (SER-77)—which would have taken hours, not weeks, to review. Moreover, defendant argued in the district court that he primarily needed time to review "complex DNA materials." (3-ER-632.) Even now, he does not explain how his personal review of these materials—which both sides retained experts to analyze—would have aided his defense. *See United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984) (holding that district court reasonably denied continuance because the defendant failed to specify how it would help his defense).

Finally, defendant is wrong that a continuance would not have prejudiced the government. (AOB 63.) Defendant's application represented the third time in roughly six weeks that the defense had requested a continuance on the eve of trial. Beyond the age of the case—which weighed heavily against a tenth continuance—"[t]he judge was rightly concerned about the expense and burden to the government of having to produce witnesses several times." *United States v. Leavitt*, 608 F.2d 1290, 1294 (9th Cir. 1979) (per curiam). Indeed, defendant offered no representation or guarantee that he would not simply request another continuance once the new trial date approached—and the government had yet again been forced to assemble its witnesses.

Ultimately, the district court had "broad discretion" in deciding whether to grant defendant's request. *Morris*, 461 U.S. at 11. "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Id.* Defendant failed to offer such a compelling reason. At minimum, the district court did not abuse its discretion by reaching that conclusion.

## E. The District Court Properly Denied Defendant's Request for New Counsel Before Sentencing

### 1. *Standard of review*

This Court reviews the denial of a motion for substitution of counsel for abuse of discretion. *United States v. Reyes-Bosque*, 596 F.3d 1017, 1033 (9th Cir. 2010). "In reviewing such a motion, we consider three factors: (1) the adequacy of the district court's inquiry; (2) the extent of the conflict between the defendant and counsel; and (3) the timeliness of defendant's motion." *Id.*

### 2. *Defendant failed to establish a basis for another counsel change before sentencing*

The district court also did not abuse its discretion by rejecting defendant's request to appoint new counsel before sentencing. (AOB 64-

65

65.)  All three of the relevant factors support the court's decision.

*First*, the district court conducted an adequate inquiry into the nature of the alleged conflict.  Specifically, the court held a closed hearing during which it questioned both defendant and his attorney about the conflict.  (4-ER-700-07.)  Defendant urges that this hearing was "wholly inadequate" because the court did not delve more deeply into his "reasons" for requesting substitution.  (AOB 65.)  But a "brief, open-ended inquiry" is appropriate in some circumstances.  *See Reyes-Bosque*, 596 F.3d at 1034.

That was the case here.  Defendant's primary complaint was that he had "been denied effective assistance of counsel," in part due to a purported conflict.  (4-ER-704.)  The district court's "own observations" of defendant's attorney during trial refuted that claim and "provided a sufficient basis for reaching an informed observation" about the request for new counsel.  *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986) (concluding that brief inquiry was sufficient in similar circumstances); *see also United States v. Smith*, 282 F.3d 758, 764-65 (9th Cir. 2002) (same).  The district court was also "familiar" with the issues raised by defendant because he had made similar complaints

about the FPDO. *Smith*, 282 F.3d at 765. Indeed, the court commented that defendant likely would have had the same complaints about "any attorney." (4-ER-705.) Thus, the district court's experience with both defendant and his attorney, coupled with their answers to its questions, provided a sufficient basis to resolve the substitution request.

*Second*, any conflict was not extensive. While defendant claims that "communications had broken down" (AOB 65), his attorney stated only that their ability to communicate had "been impacted" (4-ER-705). Moreover, defendant and his attorney apparently met *right after the hearing* (4-ER-707), and they worked together to prepare both a memorandum and a letter before sentencing. *See Reyes-Bosque*, 596 F.3d at 1034 (concluding that the conflict was not extensive because "Reyes-Bosque and [his attorney] were still speaking and met . . . to prepare for sentencing"). At most, defendant identified a disagreement about litigation strategy during the hearing—which, "without more, may not provide a sufficient basis for establishing conflict." *Id.*[6]

---

[6] Defendant also complained that one of the other attorneys who represented him at trial had a conflict because she was a former AUSA. (4-ER-703–04, 06.) On appeal, however, defendant does not argue that this purported conflict was a basis for substitution or any other relief.

*Third*, the timing of the request did not support substitution. Defendant's decision to request new counsel just three weeks after trial strongly suggested that "the breakdown was caused by the fact that he was simply unhappy with . . . the fact that he was convicted." *Reyes-Bosque*, 596 F.3d at 1034. Granting defendant's request also likely would have required "a substantial continuance" of the sentencing date, which weighed against substitution. *Id.* at 1034-35. And notably, this was not defendant's first request for new counsel. "Because [defendant] had already been granted one substitution of counsel, and was seeking to substitute one appointed counsel with another, delay is less of a consideration." *Smith*, 282 F.3d at 762. Rather, he bore the burden to "justify the replacement even in the absence of delay." *Id.* (quotation marks omitted). Defendant failed to do so here. At the very least, the district court did not abuse its discretion by concluding otherwise.

## F.    The District Court Did Not Commit Any Errors in Imposing Defendant's Sentence

### 1.    *Standard of review*

"[A]bsent objection at sentencing," this Court reviews "for plain error a claim that the district court procedurally erred by failing to

adequately explain its sentence." *United States v. Sandoval-Orellana*, 714 F.3d 1174, 1180 (9th Cir. 2013).

This Court reviews the substantive reasonableness of a sentence for abuse of discretion. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). This Court will reverse only where it has "a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors." *Id.* at 1087 (quotation marks omitted).

**2.** ***The district court did not provide a plainly insufficient explanation for defendant's sentence***

Defendant argues—for the first time on appeal—that the district court erred by failing to provide a sufficient explanation for his low-end sentence. (AOB 66-69.) He is unable to establish any of the prongs of plain-error review.

Under 18 U.S.C. § 3553(c), the district court must "state in open court the reasons for its imposition of the particular sentence." As the Supreme Court has recognized, this obligation does "not necessarily require lengthy explanation." *Rita v. United States*, 551 U.S. 338, 356 (2007). "Indeed, a sentence within the Guidelines range often needs little explanation, and a sufficient explanation can sometimes be

inferred from the record as a whole." *United States v. Vasquez-Perez*, 742 F.3d 896, 900 (9th Cir. 2014).

Under this Court's precedent, a district court does not err when it "listens to the defendants' arguments and then simply finds the circumstances insufficient to warrant a sentence lower than the Guidelines range." *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1053-54 (9th Cir. 2009) (cleaned up). In *Amezcua-Vasquez*, for instance, a district court's discussion of "the § 3553(a) factors sufficed," even though "the district court did not mention several of Amezcua's mitigating arguments pertaining to his 'history and characteristics'" and "some of these arguments were undoubtedly weighty." *Id.* at 1054. Ultimately, this Court was "satisfied that the [district] court 'listened to Amezcua's arguments' and 'then simply found these circumstances insufficient to warrant a sentence lower than the Guidelines range.'" *Id.* (alterations adopted) (quoting *Rita*, 551 U.S. at 358). "Nothing more was required[.]" *Id.*; *see also United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010) (same).

This Court should reach the same conclusion here. At the outset of defendant's sentencing hearing, the district court stated that it had

70

read the PSR, the parties' objections to the PSR, and the parties'
sentencing memoranda. (1-ER-10.) The court then heard argument
from counsel for both sides. (1-ER-12-21.) And after listening to these
arguments, the court resolved the parties' objections and decided that
defendant's arguments were insufficient to warrant a sentence below
the Guidelines range. (1-ER-22-26.) That approach did not represent
error, much less clear or obvious error. *See, e.g.*, *Valencia-Barragan*,
608 F.3d at 1108; *Amezcua-Vasquez*, 567 F.3d at 1053-54.

Defendant responds that the district court "gave no explanation at
all" for his sentence (AOB 68), but that is not true. The court explained
that a 120-month sentence was the "maximum," but "[i]t's a low term
under the guidelines." (1-ER-22.) In doing so, the court expressed
agreement with the government's argument—made right before the
sentence was imposed—that "there is certainly no reason in this case to
give a below-guideline sentence." (1-ER-20.) And even if the record
could be construed differently, the reason for defendant's sentence can
be "inferred from the PSR or the record as a whole." *United States v.
Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc). Specifically, there
was no reason to give defendant—an eight-time felon who had

committed a shooting as part of a domestic violence incident—a sentence below the Guidelines range.

Importantly, the record also reflects careful consideration of his sentencing arguments. (*See* AOB 69.) While the district court declined to impose a below-Guidelines sentence, it agreed with defendant about the Guidelines calculations and sustained his objection to the proposed supervised-release condition. Again, those rulings demonstrate that the court "listened" to defendant's sentencing arguments, but simply did not find his request for a below-Guidelines sentence persuasive. *Valencia-Barragan*, 608 F.3d at 1108.

Even assuming error, defendant makes no attempt to satisfy the third or fourth prongs of plain-error review. That failure to brief half of the standard dooms his claim because he has the burden to establish plain error. *See United States v. Romero*, 491 F.3d 1173, 1179 (10th Cir. 2007) (declining to find plain error because the defendant "does not argue on appeal that the court's failure to explain his sentence affected his substantial rights, and we will not supply such an argument for him"); *United States v. Pogosian*, 2023 WL 8663875, at *1 n.2 (9th Cir. 2023) (unpublished) (endorsing the same reasoning). Regardless, the

record does not indicate that defendant would have received a lesser sentence if the district court had provided a longer explanation. To the contrary, "[i]t would be a meaningless formality to remand the case for the court to articulate [additional] reasons." *United States v. Vences*, 169 F.3d 611, 613 (9th Cir. 1999).

Furthermore, defendant has not demonstrated that any error impacted the fairness, integrity, or public reputation of judicial proceedings. A harmless error cannot satisfy the fourth prong. *See Johnson v. United States*, 520 U.S. 461, 470 (1997). And given that defendant raised several issues after his sentence was pronounced (1-ER-26-28)—but not an objection to the district court's explanation— reversal would again "come close to rewarding the type of sandbagging that plain error review seeks to avoid." *Hougen*, 76 F.4th at 812.

### 3. *Defendant's low-end sentence was substantively reasonable*

Finally, the district court imposed a substantively reasonable sentence. "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Laurienti*, 731 F.3d 967, 976 (9th Cir. 2013) (quotation marks omitted).

This case is not one of the rare exceptions. Defendant's low-end sentence was reasonable given the aggravated nature of the offense; his long criminal history; and his lack of respect for the law. Defendant responds that other factors, like his troubled childhood, "cut in favor of a below-Guidelines sentence." (AOB 69.)[7] But "the weight to be given the various factors in a particular case is for the discretion of the district court." *United States v. Gutierrez-Sanchez*, 587 F.3d 904, 909 (9th Cir. 2009). And this Court will not reverse when the defendant "simply reargues the leniency argument he made before the district court." *United States v. Overton*, 573 F.3d 679, 700 (9th Cir. 2009). That is all defendant does. In any event, the district court did not commit a clear error of judgment in imposing a 120-month sentence given the many aggravating factors in this case.

---

[7] Defendant also alludes to his health issues (AOB 69) and recent motion for compassionate release (AOB 30 n.6). However, that motion was denied because, among other reasons, defendant has repeatedly refused to accept care that would help improve his condition. (CR 214.)

74

# VI

# CONCLUSION

For the reasons set forth above, defendant's conviction and sentence should be affirmed.

DATED: December 18, 2023   Respectfully submitted,

         E. MARTIN ESTRADA
         United States Attorney

         MACK E. JENKINS
         Assistant United States Attorney
         Chief, Criminal Division

         BRAM M. ALDEN
         Assistant United States Attorney
         Chief, Criminal Appeals Section

          *s/ David R. Friedman*

         DAVID R. FRIEDMAN
         JASON C. PANG
         Assistant United States Attorneys

         Attorneys for Plaintiff-Appellee
         UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by

Ninth Circuit Rule 32-1 because the brief contains 13,998 words,

excluding the portions exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.

32(a)(6) because it has been prepared in a proportionally spaced

typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: December 18, 2023          *s/ David R. Friedman*

                                  DAVID R. FRIEDMAN
                                  Attorney for Plaintiff-Appellee
                                  UNITED STATES OF AMERICA